# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER LEE BLUNKALL #526499,** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | **NO. 1:19-cv-00042** |
| | ) | |
| **v.** | ) | **JUDGE CAMPBELL** |
| | ) | |
| **BERT C. BOYD, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM

Christopher Lee Blunkall, a pro se state prisoner, filed a petition for the writ of habeas corpus under 28 U.S.C. § 2254 (Doc. No. 1), Respondent filed an Answer (Doc. No. 22), and Petitioner filed a Reply. (Doc. No. 25). The Reply requests the appointment of counsel (*id.* at 10) and, liberally construed, seeks to add two new claims. (*Id.* at 2–4). For the following reasons, Petitioner is not entitled to relief under Section 2254 and this action will be **DISMISSED**.

## I. PROCEDURAL BACKGROUND

A Marshall County jury convicted Petitioner of rape of a child, and the court sentenced him to 32 years' imprisonment. (Doc. No. 20-1 at 58). The Tennessee Court of Criminal Appeals (TCCA) affirmed, and the Tennessee Supreme Court denied Petitioner's application for permission to appeal. *State v. Blunkall*, No. M2014-00084-CCA-R3CD, 2015 WL 500751 (Tenn. Crim. App. Feb. 5, 2015), *perm. app. denied*, May 15, 2015. Petitioner filed original (Doc. No. 20-16 at 4–15) and amended (*id.* at 50–84) petitions for post-conviction relief. The court held an evidentiary hearing (Doc. Nos. 20-18, 20-19) and denied relief. (Doc. No. 20-16 at 136–53). The TCCA affirmed, and the Tennessee Supreme Court denied discretionary review. *Blunkall v. State*,

No. M2017-01038-CCA-R3-PC, 2019 WL 104136 (Tenn. Crim. App. Jan. 4, 2019), *perm. app.*

*denied*, Apr. 11, 2019.

## II. FACTUAL BACKGROUND

As context for Petitioner's claims, the Court sets forth the TCCA's comprehensive

summary of the evidence established at trial:

> At trial, P.R.1 testified that she lived in Estill Springs with her four minor children: the victim, B.J., who was fourteen years old and was born on May 5, 1999; S.J., who was ten years old; E.J., who was four years old; and A.R., who was five months old.
>
> [FN1 It is the policy of this court to address the minor victims of sexual crimes and their immediate family members by their initials.]
>
> P.R. said that on Monday, April 30, 2012, the victim was twelve years old, was in seventh grade, and was in special education classes. The victim could not tell time, do math, or understand anything but simple words. Additionally, the victim had difficulty understanding complex questions.
>
> P.R. said that on April 30, she woke her children, got ready for work, and got the victim and S.J. ready for school. Around 6:30 a.m., she drove the victim to the house of her maternal grandmother, E.W., in Winchester so the victim could catch the bus for school. The victim was supposed to ride the bus back to E.W.'s house after school. That afternoon, P.R. received a call from E.W., who said that the victim had gotten into a car with someone E.W. did not recognize and was missing. P.R. contacted the victim's father, who said that he had not seen the victim. P.R. went to E.W.'s house and called the police. The police came to E.W.'s house, spoke with the witnesses, then issued a missing child report.
>
> P.R. said that the victim usually carried a deactivated cellular telephone. P.R. called Verizon and had the telephone activated in an attempt to locate the victim. Throughout the night, P.R. and other family members repeatedly called the victim's telephone and sent text messages but to no avail.
>
> P.R. said that the next morning, May 1, 2012, E.W. called and told her that the victim had been found on the side of the road by a neighbor and taken to Southern Tennessee Hospital. When P.R. arrived at the hospital, the victim had a scratch on one eye and a painful knot on top of her head. The victim said that she had been raped. She "told more than one story about how things happened . . . [, and] some of those stories weren't true." The victim told her mother that she was afraid to reveal the identity of the rapist; however, "[e]very story [the victim] said always came back to [the Petitioner]. It would give different ways of how she left and

2

where she stayed, but everything came back to [the Petitioner]." The victim also said that she and the [Petitioner] went to the Walking Horse Motel. P.R. did not know the [Petitioner] prior to this incident.

P.R. said that the following day, she took the victim to the Children's Advocacy Center in Nashville for an examination. P.R. later learned that the victim and the [Petitioner] had talked on the telephone and sent each other text messages for approximately one year. The [Petitioner] was listed in the contact list on the victim's cellular telephone as "Baby Boy."

On cross-examination, P.R. said that the victim spent a lot of time with E.W. P.R. got the victim a prepaid cellular telephone for emergencies, believing the victim would be responsible with it. The victim did not use the telephone responsibly; therefore, about two months prior to April 30, P.R. had the telephone service changed so that the victim could not make or receive calls or send text messages. Nevertheless, the victim contacted the [Petitioner] by using other people's telephones without P.R.'s knowledge. When P.R. examined the contact list on the victim's telephone, she found the names of several boys and girls who the victim said were friends from school. P.R. denied that the victim was "boy crazy." P.R. did not know whether the victim sent text messages to boys.

E.W. testified that she lived in a small neighborhood on Cotton Street. A church, a graveyard, and a liquor store were all within walking distance of her house. On April 30, 2012, the victim rode the bus to E.W.'s house after school, arriving at approximately 4:10 p.m. Afterward, the victim used E.W.'s cellular telephone, purportedly to call her father.

After the call, the victim went outside with her cousin Austin to play. Around 5:00 p.m., Austin returned to E.W.'s house, but the victim did not. At that time, E.W.'s niece, Rosa Burks, called and said that the victim had been at the church nearby, that she had gotten into a green car, and that she had left. Burks asked if the victim had permission to leave, and E.W. replied that she did not. E.W. got into her van and tried to locate the green car, but she could not. E.W. then called P.R. to report that the victim was missing. Thereafter, they reported the victim's disappearance to the police. The victim's family drove around all night looking for her. When E.W. checked her cellular telephone, she learned that the text messages the victim had sent immediately prior to her disappearance had been deleted.

E.W. said that at approximately 8:00 a.m. on May 1, 2012, she was driving down Cotton Street and met her neighbor, Linda Joyce Johnson. Johnson stopped her vehicle, and E.W. saw that the victim was with Johnson. The victim told E.W. that she had been raped, and E.W. took her to the emergency room (ER) at Southern Medical Center. E.W. notified P.R. and the police that the victim had been found.

On cross-examination, E.W. said that the victim spent a lot of time with her. She did not know the victim was using her telephone to contact boys, but she later

3

learned the victim had contacted the [Petitioner] with her telephone on the day of her disappearance.

The victim testified that her date of birth was May 5, 1999, and that she lived with her mother, stepfather, and siblings. On April 30, 2012, the victim was twelve years old and in the seventh grade. Approximately one year earlier, she got the [Petitioner's] telephone number from the contact list on her older cousin Misty's telephone. She began "sneaking" and exchanging text messages with the [Petitioner]. She told him her name, age, and the name of her school. The [Petitioner] said that his name was "Chris Moore," that he was in his 20s, and that he was employed. The [Petitioner] sent the victim photographs of his face and his penis. The victim sent the [Petitioner] photographs of her face. He asked her to send photographs of her vagina, but she refused.

The victim said that she and the [Petitioner] decided to meet each other. The victim told the [Petitioner] that she loved him, and he responded in kind. She said they referred to each other by the nickname "Baby." The [Petitioner] also offered to buy the victim a necklace. They first saw each other at a movie theater in Winchester. They did not speak because Misty was there. Later, they made plans for the [Petitioner] to come to Winchester and "take [the victim] away from there." The victim thought that she and the [Petitioner] would "be together from that point on" and that they "would start a life together."

The victim said that on the morning of April 30, she went to E.W.'s house then rode the bus to school. While she was at school, she used a cellular telephone she had stolen from her cousin Austin to exchange text messages with the [Petitioner] about his coming to school to get her. However, when the [Petitioner] sent a message saying he was at the school, the victim could not leave because teachers were outside watching. At the end of the school day, the victim rode the bus to E.W.'s house. She used E.W.'s telephone to send text messages to the [Petitioner], and they ultimately arranged for him to meet her at the nearby church. The victim erased the text messages before returning the telephone to E.W. Afterward, the victim told E.W. that she was going for a walk. She took with her a bag containing some clothes and her deactivated cellular telephone.

The victim said that after she met the [Petitioner] at the church, he went to a "drive-thru" of a bank to obtain money. Later, they went to a Burger King restaurant before ending up at a motel, the "Horse Lodge," in Lewisburg. The [Petitioner] paid cash for the room, which was located upstairs. In the room, they sat on the couch, talked, and watched television. Afterward, the victim sat on the bed and removed her shirt and pants but kept on her bra and panties. The [Petitioner] completely undressed. The [Petitioner] did not put on a condom, but he put "some gooey stuff" from a bottle on his penis. The victim said that the [Petitioner] penetrated her vagina with his penis and that it "hurt." Afterward, they cleaned up and got dressed. The [Petitioner] sat on the couch most of the night, drinking and smoking. The victim slept in the bed.

4

The victim said that when she woke around 5:00 a.m., she looked at her cellular telephone and noticed she had received numerous text messages and had missed a lot of calls. One of the messages, which was from her mother, indicated that the police were looking for the victim. Soon thereafter, the victim and the [Petitioner] left the motel room. The [Petitioner] drove to a shed in "some woods" where the [Petitioner] said he lived. The victim pulled out her cellular telephone to send her mother a text message. The [Petitioner] got angry, took the telephone from her, and threw it out the car window. The [Petitioner] said he wanted her to walk with him, and they got out of the car. The [Petitioner] pushed her and hit her on the head.

The victim said that following the altercation, they got back into the car. The victim went with him because he said that he was sorry and was going to take her home. The [Petitioner] left her at a church behind a Food Lion in Winchester and drove away. The victim started walking back to her house and was picked up by her neighbor, Johnson. The victim said that she got into the car, started "telling her . . . lies," and revealed that she had been raped. They met E.W., and the victim got into E.W.'s van. E.W. called P.R. and the police to inform them that the victim had been found, then she took the victim to the hospital.

The victim said that when she spoke with employees of the Department of Children's Services (DCS), police detectives, and her mother, she told them that she had been kidnapped by a group of men in a car, that they had taken her to the woods, and that they had raped her. She said that she lied because she was afraid she would get in trouble.

On cross-examination, the victim acknowledged that she had not only sent text messages to the [Petitioner] but also to other boys. The victim said that she deleted the [Petitioner's] photographs and text messages expressing his desire to have sex with her. She was "pretty sure" that she had deleted most of the text messages they sent each other.

The victim acknowledged that she had given eight conflicting stories about what happened following her disappearance. She first told a detective that several people took her to a wooded area and raped her. She then said that a man named Chris White was with her in a motel in Manchester. Next, she said that "White became angry, grabbed [her] phone, threw it across the yard and tied her up, hands and feet, with rope, placed tape over [her] mouth in the driveway of the house." She later said that White did not tie her with rope but that he did put tape over her mouth. Her fifth version was that White had tape and threatened to put it over her mouth but did not follow through. Other versions were that White did not rape her and that she and White "stayed on the top floor in room 316 at a motel in Manchester." She also told Johnson that she had been grabbed, taken to the woods, had her mouth taped, and was raped. The victim conceded that she had told lies in the past but asserted that she was telling the truth at trial.

5

Hemant Desai, the owner of the Walking Horse Hotel in Lewisburg, testified that a man filled out a registration card on April 30, 2012. The man identified himself as "Chris Blunkall" and gave his address as 177B Cedar Grove Road, Shelbyville. The [Petitioner] indicated on the card that only one guest would stay in the room. He paid cash for the room and was assigned a room on the second floor. The [Petitioner] checked out of the room the next day.

Linda Joyce Johnson testified that she and E.W. were neighbors. On April 30, 2012, Johnson learned that the victim was missing. Around 8:00 a.m. the next morning, Johnson was driving on 4th Avenue Southwest. She was approximately one-half a mile away from Food Lion when she noticed the victim walking ahead of her. Johnson stopped her car and asked the victim where she had been. The victim looked around and said, "I've been raped." The victim got into Johnson's car and began crying. Johnson asked the victim who raped her. The victim said that she did not know him but that he was a white man. She said that the man took her into the woods, took her cellular telephone, put tape over her mouth, and hit her on the head. Johnson noticed scratches on the victim's face. As Johnson and the victim drove away, E.W. drove around the corner. Johnson "flagged her down" and told her about the victim's claims.

Winchester Police Detective Kelly Gass testified that around 5:00 p.m. on April 30, 2012, the police department received a call reporting that the victim was seen leaving with someone in a green or blue vehicle. As a result of the call, Detective Gass went to 419 Cotton Street and also put out a be on the lookout (BOLO) for the vehicle and the victim.

Detective Gass said that around 9:00 a.m. the next morning, he was informed that Johnson had found the victim near the victim's home around 8:00 a.m. Detective Gass went to Southern Tennessee Medical Center to speak with the victim. Detective Gass learned that the victim was twelve years old and that "there had been sexual intercourse involved." The victim gave various stories about what had occurred while she was missing. The victim said that her assailant was "Chris White, Chris George, everything—Chris always stayed consistent. She couldn't remember his last name." Detective Gass knew the victim was not telling the complete truth, so he continued to interview her. He also collected the victim's clothing, which consisted of her pajama pants, t-shirt, panties, and bra. He later sent the clothing to the Tennessee Bureau of Investigation's (TBI) crime laboratory for testing.

Detective Gass said that on May 2, 2012, the victim was taken to the Our Kids Child Advocacy Center in Nashville for a forensic rape examination. Later that night, Detective Gass and Detective Ronnie Durham got into a car with the victim, and she showed them the route that she and the [Petitioner] had taken the night she left. She pointed out the Regions Bank [ATM] where the [Petitioner] had gotten money. Thereafter, Detective Gass obtained the security video from the ATM. After speaking with bank personnel and viewing the security video, Detective Gass

learned that the man who used the ATM was the [Petitioner]. The video also revealed that the [Petitioner's] passenger was wearing blue jeans that were ripped at the knee; however, the passenger's face was not visible. Additionally, the [Petitioner's] bank statements revealed that he withdrew $140 from the ATM on April 30, 2012.

The victim told Detective Gass the telephone number of the man with whom she exchanged text messages. During the course of Detective Gass's investigation, he learned that the number corresponded to a TracFone the [Petitioner] was using to talk to girls or women. Detective Gass said that a TracFone was a "throwaway" prepaid telephone that could be purchased at any number of stores without disclosing any personal information. The [Petitioner] had another cellular telephone, which was associated with the [Petitioner's] Verizon Wireless account. Detective Gass researched the telephone records for the TracFone and found a woman who had met the person who owned the telephone; she said that his name was "Chris" but that she did not know his last name. The [Petitioner's] prepaid cellular telephone showed that a number of calls had been made to and from the telephones of the victim's grandmother and her cousin Austin.

Detective Gass said that on April 30, the [Petitioner] and the victim exchanged numerous text messages. In the messages, they called each other "Baby" and expressed their love for one another. The [Petitioner] said that he wanted the victim to be with him, and she encouraged him to come get her. Initially, the victim planned to sneak out of school. When that plan failed, they arranged for the [Petitioner] to go to the church near E.W.'s house. Each time that the victim appeared to want to abandon the plan to meet, the [Petitioner] cajoled or made her feel guilty until she capitulated.

Detective Gass said that he had P.R. show the victim a photograph of the [Petitioner], and the victim identified him as the perpetrator. During the investigation, the victim said that the [Petitioner's] car was green and that on the inside it had camouflage seat covers, a global positioning system (GPS) mounted on the dash, and a manual gearshift in the floor. On May 24, 2012, Detective Gass and another detective stopped the [Petitioner's] car. He was driving a two-door Mitsubishi Eclipse, which matched the description given by the victim and the car shown on the ATM's security video. The police searched the car and examined the GPS, discovering that the travel history had been erased from the device. Detective Gass also discovered the [Petitioner's] two cellular telephones inside the car. Detective Gass learned that [the] telephone number listed on the receipt from the Walking Horse Hotel matched the [Petitioner's] telephone. In a pocket behind the passenger seat, Detective Gass discovered a bottle of KY Warming Liquid.

Detective Gass said that the [Petitioner] was taken into custody and transported to the Shelbyville Police Department. Detective Gass told the [Petitioner] that the police had read the text messages exchanged by the victim and the [Petitioner].

After being advised of his *Miranda*[1] rights, the [Petitioner] was interviewed, and he gave the following written statement:

> [The victim] and I have been texting back and forth for about a year. She wanted to come stay with me, so I went to pick her up after school. I never thought it would happen, but this day, she got in my car and told me to drive. I said, where? And she said, away from here. I felt awkward sitting there, so I drove away. I didn't have anywhere to go, so instead of driving around, I drove to the bank and got money out and went to a motel. When we got to the motel it was a—a good place to sit back and think about what had just happened. I did something and didn't know what to do to undo it. She saw that I was just sitting there and so we started talking. I was talking to her when she said to shut up and kiss me, as she was crawling in my lap. So I did for about 15 minutes. I was starving, so I decided to go to Burger King and eat. I offered multiple times to get her something to eat and drink, but she said no. Got back to the motel and ate, then laid on the bed beside her and watched [television] until she woke me up. We laid there until we both fell asleep. And the next thing I know, it's early morning. I had to make a decision to just bite the bullet and take her back home. I went to get some more gas and took her back home and dropped her off close to where I picked her up. She got out and I left to go home.

On cross-examination, Detective Gass acknowledged that the victim told "a whole bunch of stories." He said that P.R. provided him with a list of the names and telephone numbers of people the victim knew. Detective Gass contacted all of the individuals. He was also present while Ashley Sowder, a DCS employee, interviewed the victim. He stepped out of the room when the victim described "the sexual contact in the hotel room."

Detective Gass said that the [Petitioner] denied having any sexual activity with the victim. The [Petitioner] never recounted the night's events in a chronological order but instead relayed "bits and parts then he would jump over things." Detective Gass said that many of the details the [Petitioner] conveyed matched those given by the victim. The primary difference was whether they had intercourse.

On redirect examination, Detective Gass said that the [Petitioner] and the victim exchanged text messages for approximately one year. From the messages, Detective Gass deduced that the [Petitioner] was "grooming" the victim. He explained that "grooming" was "where a person—usually older person, . . . actually take[s] children and they talk to them over a period of time, they build their trust up." During the interview, the [Petitioner] admitted touching the victim's clothing

---

[1] The Supreme Court announced in *Miranda v. Arizona*, 384 U.S. 436 (1966), that a defendant must be warned of his right to counsel and to remain silent before a custodial interrogation and that statements elicited in the absence of such warning or in violation of such rights are inadmissible in court.

over her buttocks and vaginal area. The [Petitioner] said that he believed the victim was fourteen years old.

Chad Johnson, a special agent forensic scientist with the serology/DNA unit of the TBI crime laboratory, testified that he conducted tests on the sexual assault kit that was performed on the victim and on the clothing the victim was wearing at the time of the incident. All of the items tested were negative for semen.

Lori Littrell testified that she was a certified registered nurse and physician's assistant with the Our Kids Center in Nashville. Littrell said that she performed a forensic sexual abuse examination on the victim at Nashville General Hospital on May 2, 2012, two days after the incident. When Littrell examined the right side of the victim's head, she found a raised area that was tender to the touch. The victim had bruises on the base of both thumbs and on her right forearm. She also had one scratch on her right cheek. When asked about the injuries, the victim stated that the [the Petitioner] hit her with a baseball bat to prevent her from using her cellular telephone to call her mother. The victim told Littrell that "Chris" had placed his penis inside her vagina and that she had experienced bleeding and pain as a result of the penetration. Littrell described the victim's affect as "somewhat blunted" and said that she had difficulty "elicit[ing] emotion from [the victim] during the exam." Littrell said that she found no injuries to the victim's external genitalia. During the internal genital examination, Littrell found discharge "in the hymen and in the vaginal vault." She also found an acute tear and redness on the hymen. She opined that the tear had occurred within three days of the examination. The injury was "consistent with blunt force penetrating trauma," which included "[t]he first time of sexual intercourse." Littrell performed a rape kit on the victim.

The thirty-three-year-old [Petitioner] testified that at the time of the incident, he had two prepaid cellular telephones. The victim initiated contact with him about one year prior to the incident. He surmised that the victim found his telephone number on someone else's telephone; however, he denied that he knew anyone named Misty. Although he did not know the victim, he began exchanging text messages with her "out of boredom." He also spoke with her a few times by telephone. He admitted sending the victim one photograph of his face but denied sending her a photograph of his genitals or requesting that she send a photograph of her genitals. The [Petitioner] told the victim his first name and may have mentioned his last name. He did not tell the victim that he was married.

The [Petitioner] said that he was not interested in having sex with the victim. He maintained contact with her because he pitied her. He explained that the victim told him stories about her troubled home life and difficult relationships with her parents and grandmother. He said that he wanted to help the victim. The [Petitioner] acknowledged that he and the victim referred to each other as "Baby" and that they expressed their love for one another. Nevertheless, he maintained that he did not intend to have "a relationship" with the victim "other than texting." He denied seeing the victim at a movie theater.

9

The [Petitioner] said that "it was obvious that [the victim] was having problems at home" and that she wanted to live with him. On April 30, 2012, he and the victim exchanged text messages. The [Petitioner] said that neither of them indicated that they wanted to meet. The [Petitioner] stated that he "had no idea" what he was going to do after the victim got into his car. He asserted, "I didn't preplan it by no means, no."

The [Petitioner] said that he did not know what the victim looked like because she had sent photographs of several individuals. He denied being sexually attracted to the victim.

The [Petitioner] said that after the victim got into his car, he realized that he was in trouble. He drove to an ATM, withdrew money, then drove to the Walking Horse Hotel. He asserted that he could not go home or to a friend's house and that he "had nowhere else to go." He did not take the victim home immediately because he was afraid of getting in trouble with the police. He decided to take her home the next morning.

The [Petitioner] said that after they checked into the room, he kissed the victim twice. Thereafter, they went to Burger King and got food; however, the victim did not want anything to eat. They returned to the room, and the [Petitioner] ate his dinner. At some point, they turned on the television. They did not discuss having sex or engage in intercourse. The [Petitioner] said that he may have unintentionally touched the victim's "private parts" over her clothing. He stated that the victim never undressed. He removed his shirt and pants while the victim went to the bathroom. He left his underwear on and crawled under the covers of the bed to sleep. When he fell asleep, the victim was on the couch. When he woke the next morning, the victim was on the bed asleep, fully dressed. They were separated by a sheet or a blanket.

The [Petitioner] said that he told the victim he was going to take her home. She got mad and said that she could not return home. He denied stopping in the woods, hitting the victim, or throwing away her cellular telephone. The victim told him to leave her at a church close to her house, and he complied.

The [Petitioner] said that he had bought the KY lubricant in North Carolina for his personal use several months prior to the incident and that it had been in his car since that time. He denied using the lubricant with anyone else.

On cross-examination, the [Petitioner] acknowledged that he may not have told the victim his last name or that he may have given her a "phony" last name. He further acknowledged that he knew he was "dealing with an underage girl." The [Petitioner] denied that he called the victim "Baby" or told her he loved her in order to pursue a romantic relationship.

10

The [Petitioner] said that he went to the victim's school solely to meet the victim. The State asked the [Petitioner] why he sent the text, "I want you to come with me, but if you're not ready, don't get my hopes up and tell me you are and you don't. Okay? That's all I ask. If you're for real, then I will call out." The [Petitioner] explained that he was supposed to call in to work at a certain time and "[t]hat's why I was trying to push the issue for her to—you know, all I wanted to do was actually meet this dadgum girl." He said that it was "just an expression" when he said "don't get my hopes up" and "[i]f you are for real."

The [Petitioner] said that he did not tell the victim he was married because he did not intend to meet her and did not believe it was "necessary" to reveal his marital status. He said that he "didn't actually want [the victim] to come out" of the school and get in his car but that "[i]f she did leave school, . . . I was going to be there for her." He acknowledged that they had previously discussed having him pretend to be her stepfather in order to check her out of school.

The [Petitioner] denied that he had been to Winchester prior to April 30, 2012. He said the victim had given him E.W.'s address. He explained that he knew there were graveyards and a liquor store near E.W.'s house because he programmed her address in his GPS. The [Petitioner] acknowledged that he erased the history from the GPS.

The [Petitioner] denied that he knew the victim intended to go home with him. He acknowledged, however, that several hours before he picked her up, the victim sent text messages saying that she intended to leave with him and that she was going to pack a bag to bring with her. He said that the victim had stated on several previous occasions that she wanted to move in with him; however, neither of them took it seriously. He stated that after he "dropped off" the victim, he stopped at a bridge to relieve himself. When he got out of the vehicle, he noticed the victim had left her bag in his car. He threw the bag into the river. He explained, "I just wanted to erase the night, you know, that happened and I really wanted to just move on and act like it just never even happened." He also explained that he did not want to be caught with the bag in his car.

The [Petitioner] acknowledged that the victim told him that she had been raped and that she previously had intercourse with "a lot" of people. However, they never discussed the two of them having sex.

The [Petitioner] acknowledged that he left Winchester after the victim got into his car because he did not want to be seen by anyone who knew him. He then drove to Shelbyville[ ] because he was familiar with the area. He said that he withdrew money from an ATM but denied planning to check into a motel. He acknowledged that when he checked into the motel in Lewisburg, he marked on the registration form that only one person would be staying in the room. The [Petitioner] conceded that he had told the officers that the victim was wearing blue jeans with holes in the knees and that he might have put his hands in those holes while kissing her. He

11

explained that the victim was wearing jeans when he picked her up and that she changed into pajama pants in the motel bathroom. He denied touching any of the victim's intimate parts over her clothes but said that if he did, the touching was unintentional.

In rebuttal, the State played a small portion of the [Petitioner's] videotaped interview, in which he acknowledged touching the victim's intimate parts over her clothing.

*Blunkall*, 2019 WL 104136, at *1–9 (quoting *Blunkall*, 2015 WL 500751, at *1–9).

## III. CLAIMS

The Petition asserts several claims. (*See* Doc. No. 1). The Reply, liberally construed, includes two more proposed claims.[2] (*See* Doc. No. 25 at 2–4). The Court considers these claims together, grouped for clarity as follows:

1.      The trial court was biased against Petitioner at sentencing. (Doc. No. 1 at 19–20).

2.      There is insufficient evidence to support the conviction. (Doc. No. 25 at 2–4).

3.      Trial counsel was ineffective in nine ways by failing to:

      A.      Remain unbiased due to the victim's age (Doc. No. 1 at 13);

      B.      Adequately investigate the case (*id.* at 14, 18–19);

      C.      Move to suppress a range of evidence before trial (*id.* at 14–16);

      D.      Retain an expert (*id.* at 14);

      E.      Secure additional testing of the rape kit (*id.* at 13–14, 17–18, 21);

      F.      Impeach the victim's testimony (*id.* at 14);

      G.      Argue insufficiency of the evidence (Doc. No. 25 at 3);

      H.      Request a jury instruction on premature deliberation (Doc. No. 1 at 13); and

---

[2]      At this stage in the case, Petitioner requires the Court's leave to amend the Petition. *See* Fed. R. Civ. P. 15(a)(1). Courts "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). One of the factors considered when "evaluating the interests of justice" is "'futility of amendment.'" *Oleson v. United States*, 27 F. App'x 566, 569 (6th Cir. 2001) (quoting *Coe v. Bell*, 161 F.3d 320, 341 (6th Cir. 1998)). Here, it would be futile for Petitioner to add the two proposed claims in the Reply, as explained below.

I. Meet the standard of assistance set forth in *United States v. Cronic*, 466 U.S. 648 (1984). (*Id.* at 15).

4. Post-conviction counsel was ineffective in two ways by failing to:

A. Raise a claim that trial counsel was ineffective for failing to secure additional testing of the rape kit (*id.* at 17, 21); and

B. Submit proof or call Petitioner to testify at the evidentiary hearing. (*Id.* at 11).

5. Petitioner is actually innocent. (*Id.* at 17, 19).

### IV. LEGAL STANDARD

Federal habeas relief for state prisoners is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Harrington v. Richter*, 562 U.S. 86, 97 (2011). AEDPA establishes a demanding standard for granting federal relief on claims "adjudicated on the merits" in state court. 28 U.S.C. § 2254(d). Under AEDPA, such a claim cannot be the basis for federal relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the

13

prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must find that the state court's application was "objectively unreasonable." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations are only unreasonable "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)).

The demanding review of claims rejected on the merits in state court, however, is ordinarily only available to petitioners who "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). "To be properly exhausted, each claim must have been 'fairly presented' to the state courts," meaning that the petitioner presented "the same claim under the same theory . . . to the state courts." *Wagner v. Smith*, 581 F.3d 410, 414, 417 (6th Cir. 2009) (citations omitted).

The procedural default doctrine is "an important 'corollary' to the exhaustion requirement," under which "a federal court may not review federal claims that . . . the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (citations omitted). A claim also may be "technically exhausted, yet procedurally defaulted," where "a petitioner fails to present a claim in state court, but that remedy is no longer available to him." *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015) (citing *Jones v. Bagley*, 696 F.3d 475, 483–84 (6th Cir. 2012)).

To obtain review of a procedurally defaulted claim, a petitioner must "establish 'cause' and 'prejudice,' or a 'manifest miscarriage of justice.'" *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1134 (6th Cir. 2016) (citing *Sutton v. Carpenter*, 745 F.3d 787, 790–91 (6th Cir. 2014)). Cause may be established by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 137 S. Ct. at 2065 (citations omitted). Prejudice requires a showing that the errors at trial worked to a petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Garcia-Dorantes v. Warren*, 801 F.3d 584, 598 (6th Cir. 2015) (quoting *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991)) (internal quotation marks omitted). And the manifest-miscarriage-of-justice exception applies "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

## V. ANALYSIS

Petitioner is not entitled to relief because his claims are either not cognizable, without merit under AEDPA's demanding standard of review for claims adjudicated on the merits in state court, or procedurally defaulted without cause. The Court will address each category of claims in turn.

15

### A. Non-Cognizable Claims

#### 1. Claim 4—Post-Conviction Ineffectiveness

Petitioner asserts that post-conviction counsel was ineffective for failing to raise a claim of trial counsel ineffectiveness, and for failing to submit proof or call him to testify at the post-conviction evidentiary hearing. (Doc. No. 1 at 11, 17, 21). As stand-alone claims for habeas corpus relief, these claims are barred by statute and long-standing precedent. 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings.") (citations omitted). Claim 4 will be denied for this reason.

In some circumstances, however, the ineffective assistance of post-conviction counsel may be used to establish the "cause" necessary "to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez v. Ryan*, 566 U.S. 1, 17 (2012). This rule is subject to several limitations, including that it can only serve as "cause to overcome the default of a single claim—ineffective assistance of trial counsel." *Davila*, 137 S. Ct. at 2062–63 (discussing *Martinez*, 566 U.S. 1; *Trevino v. Thaler*, 569 U.S. 413 (2013)). As discussed below, the Court construes Petitioner's assertions of post-conviction ineffectiveness as allegations of cause regarding his defaulted claims of ineffective assistance of counsel. *See* Section V.C.2.

#### 2. Claim 5—Actual Innocence

Petitioner asserts that he is actually innocent. (Doc. No. 1 at 17, 19). The Sixth Circuit has "repeatedly indicated" that freestanding actual innocence claims "are not cognizable on habeas" review. *Smith v. Nagy*, 962 F.3d 192, 207 (6th Cir. 2020) (citing *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007)). Accordingly, Claim 5 will be denied.

16

Although "a proper showing of actual innocence" may allow "a prisoner whose claim may otherwise be barred by various federal or state procedural rules" to "'have his federal constitutional claim considered on the merits,'" *Penney v. United States*, 870 F.3d 459, 462 (6th Cir. 2017) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013)), Petitioner has not made such a showing here. This path to review "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *McQuiggin*, 569 U.S. at 394–95 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). Petitioner does not present any new evidence, so his assertion of actual innocence cannot excuse the default of any claims.

**B. Adjudicated Claims**

Petitioner exhausted his insufficient evidence claim on direct appeal and four of his nine claims of ineffective assistance of trial counsel on post-conviction appeal.

1. <u>Claim 2—Insufficient Evidence</u>

In the Reply, Petitioner asserts that there was "no evidence to support [his] conviction beyond a reasonable doubt." (Doc. No. 25 at 2–4). The Court construes this as a claim of insufficient evidence. The TCCA correctly identified the federal standard governing claims for sufficiency of the evidence, as set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), before rejecting Petitioner's claim on the merits. *See Blunkall*, 2015 WL 500751, *9–10.

"Under *Jackson*, habeas corpus relief is appropriate based on insufficient evidence only where the court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (quoting *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007)). On federal habeas review, this standard "commands deference

at two levels": "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Id.* (citing *Parker*, 506 F.3d at 448).

The TCCA rejected this claim as follows:

> Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39–13–522(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39–13–501(7).

> The evidence, viewed in the light most favorable to the State, revealed that the victim, who had limited mental abilities, exchanged text messages with the appellant for approximately one year. On April 30, 2012, they arranged to meet at a church near her grandmother's house after school. The victim walked from her grandmother's house to the church, got into the appellant's car, and left with him. The appellant drove to an ATM, withdrew money, and took the victim to a motel in Lewisburg. When registering for the room, the appellant indicated that he would be the only person in the room. While they were in the room, the appellant applied lubricant to his penis and had intercourse with the victim. The next morning, the appellant and the victim left the motel. The victim attempted to call her mother, and the appellant threw her telephone away and hit her on the head. Thereafter, he drove the victim to a Food Lion near her home, and she got out of the car. The victim began walking home and was found by a neighbor. The victim gave several versions of events but consistently maintained that she had been raped by "Chris." A forensic sexual assault examination was performed on the victim, which revealed a tender knot on the victim's head and an injury to her hymen that was consistent with "[t]he first time of sexual intercourse."

> The appellant contends that the victim's testimony was not credible, citing her numerous versions of the incident and inconsistencies with her trial testimony. It is well-established that determining the credibility of witnesses is within the purview of the jury. *See State v. Millsaps*, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. *See State v. Carruthers*, 35 S.W.3d 516, 558 (Tenn. 2000).

> The appellant further complains that the State presented no evidence to corroborate the victim's testimony, noting that no semen was found on the victim and that none

of the text messages indicated the appellant intended to have sex with the victim. Our supreme court has held that the testimony of a minor victim, without more, is sufficient to sustain a conviction for rape of a child. *See State v. Elkins*, 102 S.W.3d 578, 582–83 (Tenn. 2003). Accordingly, no corroboration was necessary. Nevertheless, we note that the appellant's testimony corroborated much of the victim's testimony. Additionally, the victim's testimony was corroborated by the text messages and by the lubricant found in the appellant's car. Finally, the examination of the victim confirmed penetrating trauma to her hymen, which was consistent with intercourse within seventy-two hours. We conclude that there was ample evidence to sustain the appellant's conviction.

*Blunkall*, 2015 WL 500751, at *9–10.

This ruling was clearly reasonable. There is no dispute that the victim was less than thirteen at the time of the offense. Petitioner essentially contends that there was insufficient evidence because the victim was lying about the sexual penetration element of the offense. (*See* Doc. No. 24 at 3 ("[C]ounsel should have argued that the evidence does not support the conviction simply because once again the victim is lying.")). But a habeas claim of insufficient evidence resting on "an allegation involving witness credibility" cannot succeed, as witness credibility is "clearly the province of the jury." *Tyler v. Mitchell*, 416 F.3d 500, 505 (6th Cir. 2005) (citations omitted); *Hill v. Mitchell*, 842 F.3d 910, 934 (6th Cir. 2016) (citing *Herrera v. Collins*, 506 U.S. 390, 401–02 (1993)) (rejecting attacks on witness credibility because the court "cannot substitute [its] own determination of guilt in place of the jury's, and [it] cannot reweigh the evidence"); *Moreland v. Bradshaw*, 699 F.3d 908, 920 (6th Cir. 2012) (quoting *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002)) ("In general, attacks on witness credibility are 'simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence.'"). The jury heard extensive testimony that the victim lied about the incident after it occurred—from the victim's mother, from Detective Gass, and from the victim herself. The jury considered this testimony, along with all the

other evidence,[3] and found Petitioner guilty beyond a reasonable doubt. That is, "[t]he jury in this case was convinced, and the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Smith v. Cook*, 956 F.3d 377, 396 (6th Cir. 2020) (quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012)). The TCCA reasonably determined that that the answer to that question is "no." Accordingly, it would be futile to amend the Petition to add Claim 2.

### 2. Ineffective Assistance of Trial Counsel

Petitioner asserts that trial counsel was ineffective in several ways. The federal law governing the adequacy of a criminal defendant's representation is defined in *Strickland v. Washington,* 466 U.S. 668 (1984). *Premo v. Moore*, 562 U.S. 115, 121 (2011). The TCCA correctly identified this standard before rejecting four of the ineffective-assistance claims raised here on the merits. *Blunkall*, 2019 WL 104136, at *19–40.

Under *Strickland*, a petitioner must show (1) deficient performance and (2) prejudice to the defendant. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citing *Strickland*, 466 U.S. at 687). Counsel's performance is deficient where it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

---

[3] This includes evidence corroborating the victim's testimony of sexual penetration in the form of Lori Littrell's testimony regarding the forensic sexual abuse examination she performed "two days after the incident," which revealed an internal genital injury that occurred "within three days of the examination" that was "consistent with blunt force penetrating trauma," including "[t]he first time of sexual intercourse." *Blunkall*, 2015 WL 500751, at *7. The jury also considered that a bottle of lubricant was found in Petitioner's car when he was stopped a few weeks after the incident, which was consistent with the victim's testimony that Petitioner "put 'some gooey stuff' from a bottle on his penis" before he "penetrated her vagina with his penis." *Id.* at *3, 8.

Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Further, when a petitioner raises an exhausted claim of ineffective assistance in a federal habeas petition, "[t]he pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. This amounts to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Pinholster*, 563 U.S. at 190).

### A. Claim 3.B—Investigation of the Case

Petitioner asserts that trial counsel failed to adequately investigate the case. (Doc. No. 1 at 14, 18–19). On post-conviction appeal, he specifically argued that counsel did not hire an investigator, interview witnesses, or formally request discovery, leading to counsel failing to use information reflected in the victim's juvenile record.[4] *Blunkall*, 2019 WL 104136, at *37.

The TCCA rejected this claim as follows:

Trial counsel testified that he did an investigation into the victim's background, including conducting witness interviews, and that he was aware of the information contained in her juvenile file. Indeed, trial counsel testified that he saw the victim's juvenile record prior to trial. We agree with the post-conviction court based upon trial counsel's testimony at the post-conviction hearing that "it was obvious that [trial counsel] had unfettered access to all the information in the hands of Franklin County law enforcement, including access to the victim's juvenile records and to information about her family." The Petitioner has failed to present any proof substantiating his claim that counsel was ineffective for failing to hire an investigator. *William T. Minton v. State*, No. E2015-00986-CCA-R3-PC, 2016 WL 2605782, at *6 (Tenn. Crim. App. May 4, 2016) (finding that the petitioner had

---

[4]    The post-conviction court admitted the victim's juvenile record as an exhibit at the evidentiary hearing. In doing so, the court designated those records to be placed under seal from public view. (Doc. No. 20-18 at 61–62; Doc. No. 20-19 at 80–81). As explained in the accompanying Order, this Court will likewise place under seal the victim's juvenile record, along with her medical records admitted at the post-conviction hearing.

21

failed to show that trial counsel's investigation was deficient or that it caused the petitioner prejudice when trial counsel testified that he did not hire a private investigator because he conducted his own investigation and described the details of that investigation).

*Blunkall*, 2019 WL 104136, at *39.

This ruling was reasonable. At the evidentiary hearing, trial counsel testified that "he knew Detective Gass, that Detective Gass offered trial counsel access to his 'entire file' on the Petitioner's case, and that he had discussed 'material' facts of this case with Detective Gass." *Id.* at *39. In addition to Detective Gass, counsel testified that he spoke to Petitioner "and the victim's neighbors and family prior to trial." *Id.* at *38. Counsel also testified that "he saw the victim's juvenile record prior to trial," and that he "talked to 'several juvenile officers' with juvenile court 'about [the victim's] problems' she was having in that court." *Id.* The state court credited counsel's testimony regarding his investigatory efforts. This credibility finding is "entitled to great deference and must be sustained unless [it is] clearly erroneous, particularly in the context of AEDPA-limited habeas review." *Howell v. Hodge*, 710 F.3d 381, 386 (6th Cir. 2013) (internal citations and quotation marks omitted). And when crediting counsel's testimony on this point, it was reasonable for the TCCA to conclude that counsel's investigation of the case was not deficient. *See Jackson v. Warden, Chillicothe Corr. Inst.*, 622 F. App'x 457, 462 (6th Cir. 2015) (quoting *Rompilla v. Beard*, 545 U.S. 374, 383 (2005)) ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."). Accordingly, Claim 3.B will be denied.

### B. Claim 3.C—Suppression of Evidence

Next, Petitioner asserts that trial counsel was ineffective for failing to engage in any pre-trial litigation to suppress evidence. (Doc. No. 1 at 14–16). This claim was litigated extensively in

Petitioner's post-conviction proceedings, and it covers a wide range of evidence. On post-conviction appeal, Petitioner argued that counsel should have filed suppression motions regarding five groups of evidence: (1) Petitioner's text messages with the victim; (2) Petitioner's other phone records; (3) ATM surveillance footage and bank records; (4) evidence seized following the warrantless stop of Petitioner's car; and (5) Petitioner's statements to police. *Blunkall*, 2019 WL 104136, at *20.

The TCCA thoroughly analyzed this claim and rejected it in full. In doing so, it first made an overall deficiency ruling that applies to every aspect of the claim before making deficiency or prejudice rulings as it pertains to each group of evidence. This Court will consider each aspect of the TCCA's ruling in turn.

### i. Overall Deficiency Ruling

On post-conviction appeal, Petitioner took "issue with trial counsel's chosen trial strategy of calling the Petitioner to testify to dispute the victim's allegations and, thus, not seeking suppression of much of the State's evidence." *Blunkall*, 2019 WL 104136, at *20. The TCCA found that pursuing this strategy was a "reasoned, tactical decision":

> Trial counsel testified that he discussed with the Petitioner his testifying on numerous occasions and that they "practice[d]" cross-examination. After initial discussions with the Petitioner "relatively early" in the case, the Petitioner, who felt "resentment against [his] being charged with this crime," decided that he wanted to testify because "he felt he was an innocent man that had been wronged by a girl that he tried to help." The Petitioner did not testify at the post-conviction hearing or dispute trial counsel's testimony in any way. "[T]he Post-Conviction Procedure Act requires a petitioner to testify at the post-conviction hearing 'if the petition raises substantial questions of fact as to events in which the petitioner participated.'" *Timothy Evans v. State*, No. E2017-00400-CCA-R3-PC, 2018 WL 1433396, at *4 (Tenn. Crim. App. Mar. 22, 2018) (quoting Tenn. Code Ann. § 40-30-110(a) and citing Tenn. Sup. Ct. R. 28, § 8(C)(1)(b)), *perm. app. denied* (Tenn. July 19, 2018). Furthermore, trial counsel also believed that it was in the Petitioner's "best interest" to testify and "that the only chance that [the Petitioner] had to succeed in this case was to be able to convince the jury . . . that this feeling for this girl was not sexual, but rather derived from something entirely different."

> *See, e.g., Maurice Johnson v. State*, No. E2017-00037-CCA-R3-PC, 2018 WL
> 784761, at *21 (Tenn. Crim. App. Feb. 8, 2018) (concluding that trial counsel's
> advice that the petitioner testify was a matter of trial strategy in that case, reasoning
> "that trial counsel determined that it was a better strategy for the [p]etitioner to
> testify in an attempt to rebut the testimony of several witnesses who implicated the
> Petitioner rather than to remain silent[,]" and that this finding was supported by the
> record) (citation omitted), *perm. app. denied* (Tenn. June 6, 2018).

*Id.* at *21.

This ruling was not unreasonable. At the evidentiary hearing, trial counsel explained that

his support of Petitioner's desire to testify was predicated on the assumption that, regardless of

any suppression motions counsel could have filed, police were going to place Petitioner in a room

at the Walking Horse Hotel with the victim. (Doc. No. 20-19 at 25–27 ("I don't care if I had been

successful in every motion to suppress, the prosecution was still going to place him in that motel,

and they were going to have the 12-year-old girl testify.")). Based on Detective Gass's

investigatory notes, which he gave to trial counsel, that assumption was not unfounded. Gass's

notes reflected that the victim provided several different names for her assailant over the course of

the investigation, including "multiple Caucasian men with the first name Chris" and different last

names.[5] *Blunkall*, 2019 WL 104136, at *9. Gass's notes also reflected that the victim said she and

the assailant "drove to a motel . . . named something like the Walking Horse Inn." (Doc. No. 20-

24 at 7). It was therefore reasonable for counsel to believe, as stated by the post-conviction court,

that "[l]aw enforcement would sooner or later have run across the correct 'horse' hotel" and proven

that Petitioner stayed there with the victim "because he signed in under his own name." (*See* Doc.

No. 20-16 at 143). This unavoidable proof, trial counsel reasoned, "needed to be explained by

[Petitioner]." (Doc. No. 20-19 at 57). And given this trial strategy, counsel testified that pretrial

---

[5]    The victim also identified "an African-American male with the last name Taylor, who had a cross
tattoo on his arm, a Caucasian male named Shane Majors, and another individual possibly named Jordan
Masengill." *Blunkall*, 2019 WL 104136, at *9.

24

motions to suppress would "have no practical effect" on the outcome of the case. (*Id.* at 25). It was not unreasonable for the TCCA to determine that counsel's strategy fell within the wide range of reasonable professional assistance. *See Green v. MacLaren*, No. 17-1249, 2017 WL 3973956, at *2 (6th Cir. Aug. 2, 2017) (quoting *Miller v. Francis*, 269 F.3d 609, 615–16 (6th Cir. 2001); *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001)) ("[A] 'strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness.'").

### ii. Text Messages

At trial, several witnesses testified that Petitioner and the victim exchanged text messages for about 1 year before the incident on April 30, 2012. *Blunkall*, 2015 WL 500751, at *2–3, 6–7. Detective Gass testified that he received records documenting text message communications between Petitioner and the victim beginning on April 28, 2012. (Doc. No. 20-3 at 64). These records were admitted as an exhibit at trial (*id.* at 67), and Detective Gass testified regarding the contents of the records. *See Blunkall*, 2015 WL 500751, at *5 (summarizing text exchanges on the day of the incident). Detective Gass obtained these records through a Franklin County search warrant signed May 8, 2012, for phone number 2389 (Petitioner's phone). (Doc. No. 20-18 at 29–30; Doc. No. 20-24 at 36–38).

On post-conviction appeal, Petitioner argued that trial counsel should have filed a motion to suppress raising the following four challenges to this warrant: (1) the judge did not have jurisdiction to issue a search warrant for evidence located outside Franklin County and Tennessee, *Blunkall*, 2019 WL 104136, at *23; (2) Detective Gass's search warrant affidavit omitted material facts, including "the multiple lies that the victim had told him or that he had charged the victim in juvenile court with filing a false report," *id.* at *24; (3) the warrant "was not executed within five

days after its issuance," as required by state statute and rules of criminal procedure, *id.*; and (4) the records were not accompanied by an affidavit of authenticity from an appropriate corporate custodian or authorized agent, as required by state statute. *Id.*

The TCCA determined that, even assuming for the sake of argument that "trial counsel had been deficient by not filing any motion to suppress the text message communications based upon deficiencies in the warrant," Petitioner nonetheless failed to demonstrated prejudice for two reasons. *Id.* These rulings were reasonable.

First, aside from the challenged warrant for phone number 2389 (Petitioner's phone), Detective Gass also obtained separate search warrants for three numbers the victim used to communicate with Petitioner—1590 (the victim's phone), 1134 (the victim's cousin's phone), and 0091 (the victim's grandmother's phone). *Id.* at *25. The "return and inventory of property seized" section of these warrants reflects that Detective Gass received and retained text message content from the day of the incident for number 1590 (the victim's phone) (Doc. No. 20-24 at 23–24) and number 0091 (the victim's grandmother's phone). (*Id.* at 27–28). The TCCA therefore found that, even without the warrant for number 2389 (Petitioner's phone), "it was very likely that Detective Gass already had" the relevant information regarding the text message communications between Petitioner and the victim. *Blunkall*, 2019 WL 104136, at *25. And because the records obtained from the other warrants were not introduced at trial or during the evidentiary hearing, the TCCA would not speculate on their contents. *Id.* It was therefore reasonable for the TCCA to conclude that Petitioner failed to carry his burden of demonstrating prejudice in this regard. *See United States v. Gonzalez*, 560 F. App'x 554, 557–58 (6th Cir. 2014) (concluding that a defendant failed to establish "standing to challenge the admission of text messages retrieved from a phone account that was registered to someone else").

Second, when police conducted the traffic stop resulting in Petitioner's arrest on May 24, 2012, they seized Petitioner's phone with the number 2389 from the center console. *Blunkall*, 2019 WL 104136, at *11. The TCCA ruled:

> The law in effect at the time of Petitioner's trial did not preclude the State from obtaining information from the Petitioner's cell phone without a warrant when that phone was obtained incident to arrest. It was not until 2014 that the United States Supreme Court ruled that the government could not search the contents of a cell phone seized incident to an arrest without either obtaining a search warrant or proving that exigent circumstances required the warrantless search of the phone. *Riley v. California*, 134 S. Ct. 2473, 2493 (2014). "Similarly, Tennessee Code Annotated section 40-6-110, requiring a search warrant for law enforcement to examine data stored on a cell phone, such as text messages, became effective July 1, 2014." *Jeffery L. Vaughn v. State*, No. W2015-00921-CCA-R3-PC, 2016 WL 1446140, at *5 (Tenn. Crim. App. Apr. 12, 2016). The Petitioner's trial was held in 2013. Based upon precedent in place at the time of the Petitioner's trial, the text message communications could have been validly obtained once the police had the phone in their possession. This court has cautioned that "'[t]rial counsel cannot be held to a standard of being clairvoyant concerning a case not yet decided.'" *Id.* (quoting *Darryl Lee Elkins and Rhonda Grills v. State*, Nos. E2005-02153-CCA-R3-PC and E2005-02242-CCA-R3-PC, 2008 WL 65329, at *6 (Tenn. Crim. App. Jan. 7, 2008)). The Petitioner cannot show that his motion to suppress his text message communications records based upon issues with the search warrant would have been granted because the records were lawfully obtained through another method at that time.

*Blunkall*, 2019 WL 104136, at *25.

The TCCA's description of the law in Tennessee at the time of Petitioner's trial in 2013 is sound. *See Sayles v. State*, No. E2018-00141-CCA-R3-PC, 2019 WL 1417873, at *7 (Tenn. Crim. App. Mar. 28, 2019) (noting that *Riley* "directly contradicted this court's and other courts' opinions that law enforcement could search a defendant's cellular telephone incident to lawful arrest"). The Court notes that Detective Gass gave equivocal testimony at the evidentiary hearing on the question of whether, and to what extent, police actually searched the phone with number 2389 incident to Petitioner's arrest.[6] Regardless, under the law at the time, police *could* have conducted

---

[6]     (*See* Doc. No. 20-18 at 85–87 ("Q. Did you search the cell phones that were found? A. I don't remember if we did a -- probably did. There's a search warrant in here. We actually searched the phones.

such a search to potentially obtain the text message communications between Petitioner and the victim. It was therefore reasonable for the TCCA to determine that Petitioner did not demonstrate prejudice resulting from trial counsel's failure to challenge the search warrant that produced the text records introduced at trial. *See Alberts v. Perry*, No. 21-5151, 2021 U.S. App. LEXIS 29927, at *13 (6th Cir. Oct. 5, 2021) (denying certificate of appealability for claim of trial counsel ineffectiveness where TCCA held that "counsel's failure to predict the change in the law brought by *Riley* and to file a motion to suppress on that basis did not amount to deficient performance").

### iii. Other Phone Records

On post-conviction appeal, Petitioner also argued that trial counsel should have filed a motion to suppress other phone records, including records obtained from: (1) the search warrant for phone number 0091 (the victim's grandmother's phone); (2) the search warrant for phone numbers 1134 (the victim's cousin's phone) and 1590 (the victim's phone); and (3) the judicial subpoena for subscriber information regarding phone number 2389 (Petitioner's phone). *Blunkall*, 2019 WL 104136, at *26.

As to the search warrants, the TCCA determined that Petitioner failed to demonstrate deficiency or prejudice because he did not "argue that he had any possessory or privacy interest in the other three cell phones or their contexts and, thus, [could not] contest the use of [those] records." *Id.* (citing *State v. Vernon Elliot Lockhart*, No. M2013-01275-CCA-R3-CD, 2015 WL

---

Q. You do have a search warrant from searching the phones? A. For the, for the -- do you? Is that what you're saying? Q. It's, I'm asking you. A. Okay. Did you see one? Q. No, I didn't. A. Okay. Then, we didn't, we didn't search the phones right then. . . . Q. Did you have a search warrant to search the phone itself? A. That's what I'm saying, if I don't have one in here, we did not do it. . . . Q. But you did, at least, look through the phone on the side of the road? A. I don't remember if we did or not. Q. Did you try to determine, like, at least power them on and see what the phone numbers were to see if you had a match? A. We probably did.").

28

5244672, at *29 (Tenn. Crim. App. Sept. 8, 2015) (footnote omitted). This ruling was reasonable. *See Gonzalez*, 560 F. App'x at 557–58.

As to the subpoena, Detective Gass obtained a judicial subpoena from Circuit Court Judge Buddy Perry[7] on May 2, 2012 (Doc. No. 20-18 at 24–25), issued to Verizon Wireless for "[a]ny and all materials relating to phone number [ ]2389," including "any name(s), addresses, contact information, and any other phone numbers related to the above account." *Blunkall*, 2019 WL 104136, at *26. Petitioner "acknowledge[d] that 'Detective Gass received no identifying information for [the Petitioner]' through this subpoena because the phone was prepaid," but "he contend[ed] that the State used 'the lack of identifying information' during trial 'to establish that [the Petitioner] was trying to hide his identity.'" *Id.*

On post-conviction appeal, Petitioner argued that trial counsel should have filed a motion to suppress raising the following three challenges to this subpoena: (1) the judge subpoenaed records located outside Tennessee, in violation of state statute, a state Attorney General opinion, and federal statute; (2) the records were not accompanied by an affidavit of authenticity from an appropriate corporate custodian or authorized agent, as required by state statute; and (3) the records were not relevant under state rules of criminal procedure. *Id.*

The TCCA determined that Petitioner failed to demonstrate prejudice, giving five reasons to reject Petitioner's first argument (the jurisdictional argument), and one reason each for the latter arguments (the authenticity and relevance arguments). As explained below, these rationales were not unreasonable.

---

[7]     The judicial subpoena is on a Franklin County form (Doc. No. 20-24 at 30–31), but as the TCCA noted, Judge Perry was a Circuit Judge for the 12th Judicial District, which "is comprised of Franklin County, Marion County, Grundy County, Bledsoe County, Rhea County, and Sequatchie County." *Blunkall*, 2019 WL 104136, at *23 & n.4.

The TCCA's first rationale was straightforward. Petitioner asserted that Verizon headquarters was located in New Jersey. *See id.* at *23. Petitioner also elicited testimony from Detective Gass at the evidentiary hearing that, although he did not know where headquarters was located, it was not Tennessee. (Doc. No. 20-18 at 23). But "Petitioner did not provide any evidence at the post-conviction hearing that Detective Gass served the subpoena to a person located outside the State of Tennessee or that Verizon headquarters was located in New Jersey." *Blunkall*, 2019 WL 104136 at *27. It was therefore reasonable for the TCCA to conclude that Petitioner failed to carry his burden of demonstrating prejudice based on the jurisdictional argument. *See Cobble v. Smith*, 154 F. App'x 447, 451 (6th Cir. 2005) (citing *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000); *Williams v. Taylor*, 529 U.S. 362, 394 (2000)) (noting that a habeas petitioner "has the burden of demonstrating prejudice," and that the "burden is a heavy one").

Second, the TCCA ruled:

[A]n expectation of privacy for Fourth Amendment purposes has generally not been found in identifying information "such as name, address, or telephone number that is used to facilitate the routing of communications by methods such as physical mail, e-mail, landline telephone, or cellular telephone." *State v. Hill*, 789 S.E.2d 317, 319 (Ga. Ct. App. 2016) (holding that a taxi cab passenger had no legitimate expectation of privacy in his cellular phone number, name, and birthdate). First, as to communications, there is a "core distinction: although the content of personal communications is private, the information necessary to get those communications from point A to point B is not." *United States v. Carpenter*, 819 F.3d 880, 886 (6th Cir. 2016). Second, "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979) (citations omitted). This rule applies even where the person revealing information intended its use by the third party to be limited. *United States v. Graham*, 824 F.3d 421, 425 (4th Cir. 2016) (en banc). By using a phone, a person exposes identifying information to third parties, such as telephone companies, and assumes the risk that the telephone company may reveal that information to the government. *Smith*, 442 U.S. at 744.

The majority of courts to consider the question have agreed that a person's name and address is not information about which a person can have a reasonable expectation of privacy under the Fourth Amendment. [collecting cases]

*Blunkall*, 2019 WL 104136, at *27.

This ruling was not unreasonable. The TCCA cited the Sixth Circuit's opinion in *United States v. Carpenter*—an opinion later reversed and remanded by the Supreme Court. 138 S. Ct. 2206 (2018). But the information addressed by the Supreme Court in *Carpenter* is distinct from the information sought by Detective Gass through this judicial subpoena. *Carpenter* holds that "an individual has 'a legitimate expectation of privacy in the record of his physical movements as captured' by cell-site location information—even though this information is kept by (and disclosed to) a third-party wireless carrier." *United States v. Miller*, 982 F.3d 412, 431 (6th Cir. 2020) (quoting *Carpenter*, 138 S. Ct. at 2217). Detective Gass, however, sought basic subscriber information (name, address, contact information, and other phone numbers). It was not an unreasonable application of federal law for the TCCA to conclude that Petitioner had no reasonable expectation of privacy in this information. *See United States v. Jones*, No. 6:16-cr-0034-GFVT-HAI-7, 2018 WL 2329780, at *3 (E.D. Ky. May 23, 2018) (applying *Smith*, 442 U.S. at 743–44) (holding that defendant had no reasonable expectation of privacy in certain information voluntarily provided to phone carrier, including "his name, his address, his phone numbers, and the dates he activated or deactivated his phone numbers"). Accordingly, it was not unreasonable for the TCCA to conclude that Petitioner failed to demonstrate ineffectiveness regarding this judicial subpoena.

Third, the TCCA rejected Petitioner's argument based on the alleged violation of state statute as follows:

> Addressing the Petitioner's statutory argument, that Circuit Court Judge Perry did not have the authority to subpoena records located outside the State of Tennessee under Tennessee Code Annotated section 40-17-123, the Petitioner fails to recognize that any defect in this regard, if raised at the proper time, could have been cured by the State. The Petitioner makes no argument that the subpoena failed to establish a sufficient nexus between the documents requested and the criminal offense committed but only that the circuit judge exceeded his jurisdiction. *See* Tenn. Code Ann. § 40-17-123(c). Had the trial court at a motion to suppress hearing

31

found the affidavit to be insufficiently particular on this ground, the State could have obtained a subsequent subpoena that complied with the statute or pursuant to a different statute. *See Brian Dunkley v. State*, No. M2016-00961-CCA-R3-PC, 2017 WL 2859008, at *10 (Tenn. Crim. App. July 5, 2017) (noting that the petitioner did not dispute that, had the trial court found the affidavits to be insufficiently particular, the State could have simply obtained subsequent subpoenas that complied with the statute), *perm. app. denied* (Tenn. Nov. 16, 2017); *see also State v. Scott McLain*, No. E2012-01082-CCA-RM-CD, 2013 WL 709616, at *4-5 (Tenn. Crim. App. Feb. 26, 2013) (opinion on remand) (noting that the State was provided with "ample opportunity to cure the defect" of the subpoena that was signed by a court clerk rather than a judge as required by Tennessee Code Annotated section 40-17-123). Accordingly, the Petitioner cannot show prejudice.

*Blunkall*, 2019 WL 104136, at *28.

This ruling was not unreasonable. Under Tenn. Code Ann. § 40-17-123, a law enforcement officer may prepare an affidavit requesting to compel the production of "books, papers, records, documents, tangible things, or information and data electronically stored for the purpose of establishing, investigating or gathering evidence for the prosecution of a criminal offense." *Id.* § 40-17-123(a). The affidavit must "state with particularity" certain information. *Id.* § 40-17-123(c). If a judge of a court of record grants the request for a subpoena, a subpoena "shall issue to any part of the state," and it "may be served . . . in any county of the state." *Id.* § 40-17-123(f), (g). The TCCA found that, even if trial counsel successfully challenged the subpoena, the information obtained from the subpoena—that number 2389 belonged to a prepaid phone with no subscriber information—could have been obtained by re-issuing a compliant subpoena. The Sixth Circuit has determined that it was not unreasonable to find no prejudice in similar circumstances. *See Dunkley v. Phillips*, No. 20-6221, 2021 WL 3007926, at *3 (6th Cir. Apr. 22, 2021) (denying certificate of appealability for claim that trial counsel was ineffective for failing to challenge subpoena under this statute where, as here, the TCCA found that "the State could have simply obtained additional affidavits that complied with the statute," and the records obtained from the subpoena "did not provide the substance of any of the oral or written communications").

32

Fourth, the TCCA rejected Petitioner's argument based on the alleged violation of federal statute by noting that "suppression of evidence 'is not a remedy for a violation' of the Federal Stored Wired and Electronic Communications Act." *Blunkall*, 2019 WL 104136, at *28 (quoting *United States v. Guerrero*, 768 F.3d 351, 358 (5th Cir. 2014)). This statement of the law was sound. *See United States v. Jones*, 908 F. Supp. 2d 203, 209 (D.D.C. 2012) (collecting cases) ("[A]ll courts that have addressed the issue have held that the [Stored Communications Act] does not provide for a suppression remedy."). Accordingly, it was reasonable for the TCCA to conclude that Petitioner suffered no prejudice from trial counsel's failure to file a motion to suppress the subpoena based on a violation of federal statue.

Fifth, the TCCA's final reason to reject Petitioner's jurisdictional argument was that police seized the phone with number 2389 "incident to the Petitioner's arrest." *Blunkall*, 2019 WL 104136, at *28. Therefore, even without the challenged judicial subpoena, under the law in effect at the time, police could have found the subscriber information for the phone by searching it "once the police had the phone in their possession." *Id.*; *see Sayles*, 2019 WL 1417873, at *7 (explaining that, in Tennessee in 2013, "law enforcement could search a defendant's cellular telephone incident to lawful arrest"). Based on this rationale, it was reasonable to determine that Petitioner did not demonstrate prejudice resulting from trial counsel's failure to challenge the judicial subpoena for subscriber information related to phone number 2389. *See Alberts*, 2021 U.S. App. LEXIS 29927, at *13 (denying certificate of appealability for claim of trial counsel ineffectiveness where TCCA held that "counsel's failure to predict the change in the law brought by *Riley* and to file a motion to suppress on that basis did not amount to deficient performance").

Turning to Petitioner's authenticity argument, the TCCA held that Petitioner failed to demonstrate prejudice because "Petitioner made no showing that his phone records were in any

33

way inauthentic." *Blunkall*, 2019 WL 104136, at *28. Although Petitioner elicited testimony from the Marshall County Circuit Court Clerk that "an affidavit [of authenticity] from the custodian of records was not found in the Petitioner's case file," the TCCA did not consider that sufficient to establish "that the records were not what they were purported to be or that the Petitioner was prejudiced due to the alleged inauthenticity of the records." *Id.* Because the burden of showing prejudice lies with Petitioner, this ruling was reasonable. *See Cobble*, 154 F. App'x at 451 (noting the heavy burden a habeas petitioner faces to demonstrate prejudice under *Strickland*).

As to Petitioner's relevance argument, the TCCA held that Petitioner failed to demonstrate prejudice because he merely noted that trial counsel "'made no objections to relevance,'" without making "any legal argument as to why the information obtained pursuant to this subpoena was irrelevant." *Blunkall*, 2019 WL 104136, at *28. Again, it was reasonable for the TCCA to conclude that Petitioner failed to carry his burden of showing prejudice. *See Cobble*, 154 F. App'x at 451.

For all of these reasons, Petitioner is not entitled to relief on his claim that trial counsel was ineffective for failing to file a motion to suppress challenging the judicial subpoena for subscriber information regarding phone number 2389.

#### iv. ATM Surveillance Footage and Bank Records

Detective Gass obtained two more judicial subpoenas: one for ATM surveillance footage, and another for bank records. Petitioner raised the same challenges to these two subpoenas, so the TCCA addressed them together. *See Blunkall*, 2019 WL 104136, at *29–32.

As to the first subpoena, during Detective Gass's investigation, the victim "pointed out the Regions Bank [ATM] where the [Petitioner] had gotten money." *Blunkall*, 2019 WL 104136, at *4. "On May 7, 2012, Detective Gass obtained a subpoena for the Regions Bank ATM security video footage from April 30, 2012, seeking the recording from the Shelbyville location where the

34

victim said that she had stopped with the Petitioner." *Id.* at *10. "The subpoena application was signed . . . by Judge Thomas Faris, a general sessions judge in Franklin County." *Id.* at *29.

As to the second subpoena, Detective Gass spoke with Patty Thomas on May 22, 2012, and Thomas "knew the individual using the number 2389 as 'Chris,' although she did not know the individual's last name." *Id.* at *10 & n.2 (citing *Blunkall*, 2015 WL 500751, at *5.) Thomas also gave Detective Gass a description of the vehicle driven by the individual she knew as Chris, which matched a description previously given by the victim. *See id.* at *5, 10. Detective Gass reviewed the ATM surveillance footage and observed a vehicle matching the description arrive to the ATM "at approximately 5:48 p.m. on April 30, 2012." *Id.* at *10. Gass asked a Regions Bank security employee "if the first name of the person using the ATM" at that time "was Chris," and the employee said yes. *Id.* Gass then obtained a subpoena for the bank records of the person using the ATM at that time, which confirmed that Petitioner was "the man in the ATM surveillance video footage." *Id.* at *10–11. As with the subpoena for the ATM surveillance footage, this subpoena was signed by Franklin County General Sessions Judge Faris. *Id.* at *29.

On post-conviction appeal, Petitioner argued that trial counsel should have filed a motion to suppress raising the following two challenges to these subpoenas: (1) the judge subpoenaed records located outside Franklin County, in violation of state and federal statutes; and (2) Petitioner was not notified of the subpoenas before they were served on Region Bank, in violation of state and federal statutes. *Id.* at *30

For three reasons, the TCCA determined that Petitioner failed to demonstrate prejudice resulting from trial counsel's failure to file such a motion. These rulings were reasonable.

First, regardless of any jurisdictional defects, the TCCA found that Petitioner did not have a constitutionally protected privacy interest in the ATM surveillance footage or the bank records.

35

*Blunkall*, 2019 WL 104136, at *30–31 (citing *United States v. Taketa*, 923 F.2d 665, 677 (9th Cir. 1991) (ATM surveillance footage); *United States v. Miller*, 425 U.S. 435, 443 (1976) (bank records)). Petitioner has not shown that these rulings were contrary to or an unreasonable application of clearly established federal law. *See United States v. Vankesteren*, 553 F.3d 286, 290 (4th Cir. 2009) (adopting the Ninth Circuit's statement in *Taketa* that "[v]ideotaping suspects in public places, such as banks, does not violate the fourth amendment"); *Carpenter*, 138 S. Ct. at 2220 ("We do not disturb the application of *Smith* [*v. Maryland*, 442 U.S. 735] and *Miller* or call into question conventional surveillance techniques and tools, such as security cameras."); *Miller*, 425 U.S. at 443 (citation omitted) ("The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government."). Therefore, it was not unreasonable for the TCCA to determine that Petitioner failed to demonstrate prejudice from trial counsel's failure to challenge these two judicial subpoenas.

Second, the TCCA rejected Petitioner's argument based on the alleged violation of state and federal statutes because "neither the federal nor state privacy 'acts mandate[ ] suppression of evidence as a remedy for violating their mandatory requirements.'" *Blunkall*, 2019 WL 104136, at *31. This was an accurate statement of state and federal law. *See Charles v. United States*, No. 1:13-MC-46, 2013 WL 6404632, at *3 (W.D. Mich. Aug. 22, 2013) (collecting cases) ("[F]ederal courts universally hold that the damage remedy specified in 12 U.S.C. § 3417(a) is the exclusive remedy against the government and that a violation of the [Federal Right to Financial Privacy Act] does not authorize a court to suppress or exclude evidence."); *State v. Bradford*, No. M2012-02616-CCA-R3CD, 2014 WL 2494548, at *15 (Tenn. Crim. App. May 30, 2014) (concluding that alleged violation of the Tennessee Financial Records Privacy Act's notice requirement "did not render . . . financial records inadmissible at the Defendant's trial"). It was therefore reasonable for

the TCCA to conclude that Petitioner suffered no prejudice from trial counsel's failure to file a motion to suppress the subpoena based on a violation of state and federal privacy statutes.

Third, referencing its analysis of the previous judicial subpoena, the TCCA found that any jurisdictional defects in these two subpoenas under Tenn. Code Ann. § 40-17-123, "if raised at the proper time, could have been cured by the State." *Blunkall*, 2019 WL 104136, at *32. As stated above, that was not an unreasonable determination. *See Dunkley*, 2021 WL 3007926, at *3 (denying certificate of appealability for claim that trial counsel was ineffective for failing to challenge subpoena under Section 123 where, as here, the TCCA found that "the State could have simply obtained additional affidavits that complied with the statute").

For all of these reasons, Petitioner is not entitled to relief on his claim that trial counsel was ineffective for failing to file a motion to suppress challenging the judicial subpoenas for ATM surveillance footage and bank records.

v. Evidence Seized Following Warrantless Stop of Petitioner's Car

On May 24, 2012, Detective Gass and Detective Brian Crews of the Shelbyville Police Department drove to Petitioner's home "in separate, unmarked police cars," and "no one was home." *Blunkall*, 2019 WL 104136, at *11. The two detectives "were traveling towards the Petitioner's work when Detective Crews spotted the Petitioner driving." *Id.* Gass testified that they initiated a traffic stop to "speak with" Petitioner, and "he did not observe the Petitioner commit any crimes" prior to the stop. *Id.* Gass also "confirmed that, at the time of the stop, there was no arrest warrant for the Petitioner and no search warrant for the Petitioner or his car." *Id.*

The TCCA summarized Detective Gass's evidentiary hearing testimony on what happened during the traffic stop:

Once stopped on the side of the road, both officers made contact with the Petitioner. Upon approaching the vehicle, Detective Gass saw that "there were things in the

37

car that actually matched . . . what [the victim] had said." Detective Gass described that the Petitioner's vehicle "appear[ed] to be dark green at one angle and light green at another," that the two front seats "had Mossy Oak seat covers," that there was a GPS device "that mount[ed] on the dash in the front passenger floorboard," and that the car was a "manual shift." Detective Gass confirmed that the Petitioner gave verbal consent to search his automobile, although Detective Gass could not remember how long they spoke to the Petitioner before he provided his consent. In addition, when asked the details surrounding the Petitioner's consent, Detective Gass testified that he did not know "the words that were asked" of the Petitioner in seeking his consent because Detective Crews "got the consent" and that the specifics of that consent "would be something" to ask Detective Crews about. Detective Gass explained that Detective Crews took charge of speaking with the Petitioner because they "were in his jurisdiction." According to Detective Gass, he "played a little bit more of a back-up role" on the side of the road because they were not "for sure if the actual sex part of the information happened in Shelbyville or somewhere[ ] else." A cell phone with the number 2389 was found "in the center console of the vehicle," and a second cell phone was also found inside the vehicle. In addition, a bottle of lubricant was discovered in the car. Detective Gass confirmed that they "looked through" the Petitioner's GPS device while on the side of the road and that they did not have a search warrant to do so at that time. Detective Gass could not remember whether they obtained any separate consent from the Petitioner to search his GPS device or the cell phones found inside the car.

*Id.*

On post-conviction appeal, Petitioner argued that trial counsel should have filed a motion to suppress the evidence obtained from the stop, both because police lacked reasonable suspicion or probable cause to initiate the stop, and because any consent to search his car was involuntary and limited in scope. *See id.* at *32–33. The TCCA determined that Petitioner failed to demonstrate prejudice for both the stop and the search, and these rulings were reasonable.

As to the stop, the TCCA ruled that trial counsel was not ineffective because police had probable cause to stop and arrest Petitioner:

Trial counsel testified that he believed that the officers "had enough probable cause . . . to have made that stop" and to have ultimately arrested the Petitioner on the scene. Regardless of any pretext, the record supports trial counsel's conclusion that the stop was supported by probable cause. One of the exceptions to the warrantless arrest of an individual is when an officer has probable cause for believing that the person has committed a felony. *See* Tenn. Code Ann. § 40-7-103(a)(3); *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012) (citing *State v. Hanning*, 296 S.W.3d

44, 48 (Tenn. 2009)). "Probable cause . . . exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" *Echols*, 382 S.W.3d at 277–78 (quoting *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997)).

At the time of the traffic stop, the victim had consistently, although not exclusively, identified "Chris" as a person who raped her. Detective Gass had independent information that someone had picked the victim up and that she had gone missing. Detective Gass had the text message communications between the victim and the Petitioner. The victim was able to locate an ATM in Shelbyville where she stopped with the Petitioner on April 30, 2012, and he withdrew money. Detective Gass had watched the ATM's surveillance footage, which provided details consistent with the victim's account. He had also received the Petitioner's identifying information from Regions Bank. Furthermore, Detective Gass sent a copy of the Petitioner's driver's license picture to Patty Thomas, who said that the person in the photograph appeared to be the individual she knew as "Chris" with the phone number 2389. The victim also identified a photograph of the Petitioner. In addition, Detective Gass had the report from Our Kids Center, wherein Ms. Littrell had determined that the victim's injuries were consistent with penetration. The Petitioner has failed to establish that a motion to suppress in this regard had a reasonable probability of success. *See Giddens*, 2008 WL 271967, at *6 (citing *Strickland*, 466 U.S. at 694).

*Blunkall*, 2019 WL 104136, at *32.

This ruling was reasonable. "A warrantless arrest by an officer is reasonable under the Fourth Amendment when the arrest is in public and there is probable cause to believe that a criminal offense has been or is being committed." *Fox v. DeSoto*, 489 F.3d 227, 235–36 (6th Cir. 2007) (citing *United States v. Watson*, 423 U.S. 411, 417 (1976)). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44 n.13 (1983)). "[T]he existence of probable cause 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" *Fox*, 489 F.3d at 236 (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). Here, based on the facts known to Detective Gass at the time of the stop, as set out by the TCCA, there was probable cause to

arrest Petitioner. Petitioner therefore failed to demonstrate ineffectiveness resulting from trial counsel's handling of the stop.

As to the search of Petitioner's vehicle, the TCCA ruled that trial counsel was not ineffective because the only evidence presented in the post-conviction proceedings reflects that the search was consensual:

> At the post-conviction hearing, Detective Gass confirmed that the Petitioner gave verbal consent to search his automobile. In addition, when asked the details surrounding the Petitioner's consent, Detective Gass testified that he did not know "the words that were asked" of the Petitioner in seeking his consent because Detective Crews "got the consent" and that the specifics of that consent "would be something" to ask Detective Crews about. Detective Gass could not remember whether they obtained any separate consent from the Petitioner to search his GPS device and cell phones found inside the car. In addition, trial counsel testified that the Petitioner consented to the search and that he confirmed as much to trial counsel. Again, Detective Crews was not called to testify, and the Petitioner did not testify to dispute the allegation that he gave consent to search or whether that consent was limited. We note once more that "the Post-Conviction Procedure Act requires a petitioner to testify at the post-conviction hearing 'if the petition raises substantial questions of fact as to events in which the petitioner participated.'" *Evans*, 2018 WL 1433396 (quoting Tenn. Code Ann. § 40-30-110(a) and citing Tenn. Sup. Ct. R. 28, § 8(C)(1)(b)). The Petitioner has once again failed to establish his allegations of fact supporting his grounds for relief by clear and convincing evidence and asks that we grant relief based upon mere speculation.

*Blunkall*, 2019 WL 104136, at *33.

This ruling was not unreasonable. "The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances.'" *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). Based on the only evidence before it—the testimony of Detective Gass and trial counsel—the TCCA concluded that Petitioner's consent to search his vehicle was voluntary. Petitioner also did not present any evidence that his consent was limited in a particular way. Accordingly, it was not unreasonable for the TCCA to determine that Petitioner

failed to carry his burden of showing ineffectiveness resulting from trial counsel's handling of the search of his vehicle.

In sum, Petitioner is not entitled to relief on his claim that trial counsel was ineffective for failing to file a motion to suppress challenging the stop and search of Petitioner's car.

### vi. Statements to Police

The final group of evidence that Petitioner claims trial counsel should have sought to suppress is his statements to police. After police took Petitioner into custody, he gave a written statement and participated in an interview. *See Blunkall*, 2019 WL 104136, at *5. At trial, the prosecution introduced the written statement and played a portion of the interview for the jury. *See id.*; (Doc. No. 20-3 at 116–20, 126–27). The TCCA summarized the circumstances of Petitioner's statements as follows:

> At the outset of the interview, when Detective Crews told the Petitioner that they were there to discuss some "very serious allegations," the Petitioner replied, "Do I need a lawyer or anything?" Detective Crews told the Petitioner that he could not "make that decision for [him]," that he would read the Petitioner his rights and make sure he understood them, and that "it would be up to" him at that point to decide if he wanted to talk with the detectives. Detective Crews continued, "I've got to read this to you and make sure you understand it. And, then if you agree, we'll ask those questions, and hopefully you can answer them to the best of your ability at that time." After Detective Crews read the Petitioner his *Miranda* rights "rather quickly," the Petitioner gave an affirmative indication that he understood those rights and then signed the waiver form.

*Blunkall*, 2019 WL 104136, at *34.

On post-conviction appeal, Petitioner argued that his *Miranda* waiver was not valid because "Detective Crews 'completely omitted the portion of the waiver of rights that encompassed [the Petitioner's] understanding of his rights and his willingness to waive them.'" *Id.* The TCCA rejected this argument:

> An explicit waiver may be written or oral. *State v. Steven James McCain*, No. M2000-02989-CCA-R3-CD, 2002 WL 1033249, at *6 (Tenn. Crim. App. May 22,

41

2002). A defendant's "express waiver after being informed of his *Miranda* rights is 'strong proof of the validity of the waiver.'" *State v. Freeland*, 451 S.W.3d 791, 814 (Tenn. 2014) (citing Butler, 441 U.S. at 373). In addition, "the State may establish an implicit waiver of *Miranda* rights by showing that the suspect received and understood *Miranda* warnings, did not invoke *Miranda* rights, and gave an uncoerced statement to the police." *State v. Climer*, 400 S.W.3d 537, 565 (Tenn. 2013).

Here, the Petitioner signed the waiver form, albeit somewhat quickly. But, prior to signing the waiver, Detective Crews told the Petitioner why he was reading the form to him. Moreover, that Detective Crews did not explicitly ask the Petitioner whether he would be willing to waive his rights and answer questions does not warrant suppression of the Petitioner's statement because the Petitioner clearly indicated that he understood the rights of which he was advised—one of which was his right to remain silent—and chose to answer Detective Crews's questions. *See Berghuis v. Thompkins*, 560 U.S. 370, 385–87 ([ ]2010)[8] (concluding that the defendant's waiver could be inferred where the evidence established he was provided a written copy of *Miranda* warnings, each warning was read aloud to the defendant, the defendant never indicated that he did not understand the rights, the defendant provided a statement after remaining silent for almost three hours, and where there was no evidence of coercion); *see also Climer*, 400 S.W.3d at 565 ("[T]the State may establish an implicit waiver of *Miranda* rights by showing that the suspect received and understood *Miranda* warnings, did not invoke *Miranda* rights, and gave an uncoerced statement to the police.").

The record is devoid of any evidence that the Petitioner was coerced, threatened, or tricked into signing the waiver and giving a statement. *See Miranda*, 384 U.S. at 476 (stating that evidence that the suspect was "threatened, tricked, or cajoled" into a waiver will show that the Fifth Amendment privilege was not voluntarily waived). Again, we note that the Petitioner did not testify at the post-conviction hearing, and "the Post-Conviction Procedure Act requires a petitioner to testify at the post-conviction hearing 'if the petition raises substantial questions of fact as to events in which the petitioner participated.'" *Evans*, 2018 WL 1433396, at *4 (quoting Tenn. Code Ann. § 40-30-110(a) and citing Tenn. Sup. Ct. R. 28, § 8(C)(1)(b)). Moreover, we conclude that the Petitioner's course of conduct sufficiently showed that he understood and knowingly waived his rights after being given an opportunity to exercise them. [collecting cases] Once again, the Petitioner cannot show that trial counsel's failure to file a motion to suppress his police statement amounted to ineffective assistance.

*Blunkall*, 2019 WL 104136, at *34–35.

---

[8]  The TCCA accurately identified and applied *Berghuis*, a United States Supreme Court decision, but the omitted portion of this citation to *Berghuis* mistakenly reflected that it was a Tennessee Supreme Court decision.

The TCCA's determination that Petitioner validly waived his rights was not an unreasonable application of federal law. "[T]he law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 385 (citation omitted). "To establish an implied waiver, the prosecution must show (1) that a *Miranda* warning was given, (2) that it was understood by the accused, and (3) that the subsequent statement was uncoerced." *United States v. Miller*, 562 F. App'x 272, 289 (6th Cir. 2014) (citing *Berghuis*, 560 U.S. at 384).

On post-conviction appeal, Petitioner did not meaningfully contest the first and third requirements of an implied waiver, and the TCCA's rulings in this regard were sound. That is, the record reflects that Detective Crews gave Petitioner a *Miranda* waiver by reading the rights verbatim from an "Admonition and Waiver Form." And Petitioner presented no evidence of coercion, so it was reasonable for the TCCA to find, based on the evidence before it, "that the Petitioner's course of conduct sufficiently showed that he . . . knowingly waived his rights after being given an opportunity to exercise them." *Blunkall*, 2019 WL 104136, at *35; *see also Treesh v. Bagley*, 612 F.3d 424, 434 (6th Cir. 2010) (finding that state court did not unreasonably apply federal law in finding that petitioner's waiver was "knowing and intelligent" where, among other things, there was no evidence of diminished mental state, he made statements indicating that he understood his rights, and he signed a written waiver).

Rather, Petitioner argued that the prosecution would not have been able to establish that he understood his rights. The TCCA, however, determined that "Petitioner clearly indicated that he understood the rights of which he was advised," *Blunkall*, 2019 WL 104136, at *34, and this ruling is supported by the record. Although Detective Crews did not read the portion of the "Admonition

43

and Waiver" form titled "Waiver of Rights," Crews did say, "I will read you your rights and make sure you understand your rights, and then it will be up to you at that point in time if you decide you want to talk to us or not." (Respondent's Exhibit Manually Filed Nov. 6, 2019, Post-Conviction Exhibit 19 (Interrogation Video) at 9:30).[9] He also said, "I've got to read this to you and make sure you understand it, and then, if you agree, we'll ask those questions and hopefully you can answer them to the best of your ability at that time." (*Id.* at 9:45). Then, after Crews read Petitioner his *Miranda* rights, Crews asked, "Do you understand that?", and Petitioner nodded his head in the affirmative[10] before signing the form. (*Id.* at 10:18; *see* Doc. No. 20-24 at 97 (signed form stating, among other things, "Before we ask you any questions, you must understand your rights," "I understand what my rights are," and "I understand and know what I am doing.")). Given this sequence of events, it was not unreasonable for the TCCA the conclude that Petitioner indicated understanding of the *Miranda* warning just given by Detective Crews. It was therefore reasonable for the TCCA to conclude that Petitioner failed to demonstrate prejudice resulting from trial counsel's decision not to file a motion to suppress Petitioner's statements to police.

In sum, the TCCA carefully considered each aspect of Petitioner's wide-ranging claim that trial counsel was ineffective for failing to seek suppression of evidence. The TCCA determined that trial counsel's strategic decision not to engage in any pre-trial suppression litigation fell within the wide range of reasonable professional assistance, and it further concluded that Petitioner failed to show deficiency and/or prejudice for each group of evidence in question. As discussed above, these determinations were not unreasonable. Accordingly, Claim 3.C will be denied.

---

[9]     Citations to the video's timestamp reflect the approximate start time of an event.

[10]     The audio is not clear on this point, but it sounds as though Petitioner may have softly said "Yes" when he nodded his head. Regardless, this Court's review of the interrogation video confirms that it was not unreasonable for the TCCA to find that "Petitioner clearly indicated that he understood the rights of which he was advised" before answering questions. *Blunkall*, 2019 WL 104136, at *34.

C. Claim 3.D—Retaining an Expert

Petitioner asserts that trial counsel was ineffective for failing to retain an expert to rebut the State's expert, Lori Littrell. (Doc. No. 1 at 14; Doc. No. 20-4 at 67). Littrell testified regarding the forensic sexual abuse examination she performed on the victim on May 2, 2012—two days after the incident. *See Blunkall*, 2019 WL 104136, at *6. Littrell found, among things, that the victim had an acute tear on her hymen. (Doc. No. 20-4 at 83). When asked to provide a "timeframe" for the tear, Littrell responded: "It is impossible to specifically date injury. What I can say, is just in my experience in our practice, the way that specific injury looked, typically, I would feel comfortable saying that that had occurred within the past three days. But, again, it's impossible to nail it down to an exact hour." (*Id.* at 84).

At the post-conviction evidentiary hearing, Petitioner called Patricia Speck as a witness, and the court allowed her to testify as an expert "in the area of forensic nursing and specifically in the area of child sex abuse." (Doc. No. 20-18 at 133). Speck testified that she reviewed Littrell's trial testimony, the report of Littrell's forensic sexual abuse examination, the victim's hospital records, "and the documents prepared by Detective Gass." *Blunkall*, 2019 WL 104136, at *13. "Speck testified that she had 'a problem with putting a timetable' on the victim's injuries and, therefore, she viewed Ms. Littrell's trial testimony that the victim's injuries were 'acute' having occurred 'within [seventy-two] hours of the examination' as questionable." *Id.*

On post-conviction appeal, Petitioner argued that trial counsel was ineffective for failing to retain an expert such as Speck to rebut Littrell's testimony on the timing of the victim's injury. *Id.* at *35. The TCCA rejected this argument:

> [W]e agree with the post-conviction court that "it cannot be found that, but for the failure to generate a medical expert at trial, the outcome of the case would have been any different." Ms. Littrell stated at trial that she could not "specifically date injury[,]" but she did opine that the victim's "recent" injury "had occurred within

45

the past three days." Ms. Speck and Ms. Littrell did not differ in all respects; having Ms. Speck testify would have presented disagreeing experts about the ability to determine the timing of an injury or the duration of recovery. It was undeniable that the victim was bleeding during the examination. Ms. Littrell testified that she observed an acute tear and redness on the victim's hymen and that the victim had discharge in the vaginal vault. The evidence, which included the ATM video recording, the hotel owner's testimony, the text message communications, and the Petitioner's own statement admitting to kissing the victim, overwhelmingly supported the Petitioner's guilt. As the post-conviction court accurately observed, "The jury would have had to believe[] that the vaginal bleeding was coincidental and unrelated to the transporting of the [twelve-year-old victim] to a Lewisburg hotel." We hold that the post-conviction court did not err in concluding that the Petitioner failed to show prejudice through proof of a reasonable probability of a different result at the trial. *See, e.g., Curtis Cecil Wayne Bolton v. State*, No. E2014-00559-CCA-R3-PC, 2015 WL 4557754, at *22 (Tenn. Crim. App. Jan. 22, 2015) (holding that, although a defense medical expert might have been able to testify about the timing of the victim's injury, the evidence nevertheless overwhelmingly pointed to the petitioner as the person who fatally injured the victim, and the petitioner had failed to establish prejudice).

*Blunkall*, 2019 WL 104136, at *36.

This ruling was reasonable. That is, even if trial counsel put on an expert to counter Littrell's testimony on the timing of the victim's injury, there is not a reasonable probability that the trial result would have been different. Littrell's testimony on this point was already somewhat equivocal, as she readily stated that "[i]t is impossible to specifically date injury." (Doc. No. 20-4 at 84). On cross-examination, trial counsel elicited testimony from Littrell underscoring this point. (*See id.* at 91 (testifying that she did not know "exactly" when the injury occurred, "[j]ust that it was recent")). As explained by the Supreme Court, and recently reiterated by the Sixth Circuit, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Kendrick v. Parris*, 989 F.3d 459, 472 (6th Cir. 2021) (quoting *Harrington*, 562 U.S. at 111). Given the other evidence cited by the TCCA—in addition to the testimony of the victim herself—it was reasonable for the TCCA to conclude that Petitioner failed to demonstrate prejudice for this claim. Claim 3.D will be denied.

46

D. <u>Claim 3.F—Impeaching the Victim's Testimony</u>

Petitioner asserts that trial counsel was ineffective for failing to adequately impeach the victim's testimony. (Doc. No. 1 at 14). On post-conviction appeal, Petitioner argued that trial counsel should have impeached the victim's credibility using her juvenile record reflecting adjudications for theft and filing a false police report. *Blunkall*, 2019 WL 104136, at *37. The TCCA ruled that Petitioner failed to demonstrate both deficiency and prejudice for this claim. As to deficiency, the state court ruled:

> [T]rial counsel testified that he believed an overtly aggressive cross-examination of the victim would be ineffective and make her more sympathetic to the jury. The post-conviction court found that trial counsel's "strategy to avoid the risk of inflaming the jury" by more vigorously cross-examining the victim "[was] entirely defensible." We agree that trial counsel's approach was reasonable and based upon a sound trial strategy. *See William James Watt v. State*, No. M2015-02411-CCA-R3-PC, 2016 WL 6638856, at *6 (Tenn. Crim. App. Nov. 10, 2016) (concluding that trial counsel's decision not to attack the six-year-old victim was a reasonable trial strategy).

*Blunkall*, 2019 WL 104136, at *40.

This ruling was clearly reasonable. The victim was twelve at the time of the incident and fourteen at the time of trial. (Doc. No. 20-2 at 70, 75). Trial counsel testified that, given the victim's age at the nature of the case, he "had to show her respect, yet at the same time, [] put it before the jury that she had consistently not told the truth." (Doc. No. 20-19 at 35; *see also id.* at 64 (testifying that he "had to be rather careful in the manner in which [he] approached her, to avoid in any way creating in the mind of the jury, a sympathetic person.")). Counsel's strategy of avoiding an overtly antagonistic posture with the victim was presumptively sound. *See Strickland*, 466 U.S. at 689.

As to prejudice, the TCCA ruled:

[T]he post-conviction court determined that the Petitioner had failed to establish prejudice in this regard: "It cannot be said that, but for the absence of a scolding examination of the victim, the outcome of the trial would have been different." The jury was aware that the victim had told numerous lies, and this information came

from several witnesses at trial. Moreover, the following colloquy between the victim and the prosecutor occurred during the Petitioner's trial:

> Q. . . . I mean, you told a bunch of lies, didn't you?
>
> A. Yes, sir.
>
> Q. Well, why didn't you just tell them the truth, that you ran off with an older man and spent the night in a motel room and he had sex with you?
>
> A. Because I knew I was going to get in trouble.
>
> Q. Okay. And it's fair to say, actually, you wound up getting in trouble, didn't you?
>
> A. Yes, sir.
>
> Q. Had to go to juvenile court?
>
> A. Yes, sir.
>
> Q. And they put you on probation for not telling the truth to them?
>
> A. Yes, sir.

Therefore, the fact that the victim had been subjected to punishment in juvenile court for telling Detective Gass multiple lies was information that was in fact placed before the jury.

In addition, even if the theft adjudication were admissible as impeachment evidence, *see* Tennessee Rules of Evidence 608 and 609, evidence of that adjudication would have "done little to further vitiate" her credibility. *See Berry v. State*, 366 S.W.3d 160, [1]80 (Tenn. Crim. App. 2011). The victim's trial testimony was corroborated by much of the State's evidence that was properly admitted into evidence as discussed above. Finally, the juvenile records only contained the victim's grades and did not speak to her mental capacity, and thus, the record does not support the Petitioner's assertion that those records "completely contradicted the testimony elicited by the State that [the victim] was intellectually disabled." And, as noted above, it was undeniable that the victim was bleeding during the examination. Ms. Littrell testified that she observed an acute tear and redness on the victim's hymen and that the victim had discharge in the vaginal vault. We agree with the post-conviction court that the Petitioner has failed to establish prejudice in this regard.

*Blunkall*, 2019 WL 104136, at *40.

This ruling was reasonable as well. Although trial counsel did not ask the victim about her juvenile record, he made the victim's credibility a centerpiece of his questioning. The record reflects that, after trial counsel asked the victim about the many differing accounts she gave during the investigation, he asked, "Now, tell the ladies and gentlemen of the jury, after you've told all these lies, why they're supposed to believe the story you're telling here today?" (Doc. No. 20-2 at 173–76). Trial counsel also asked several other witnesses about the victim's inconsistencies. (*See id.* at 36 (asking the victim's mother about "all kind of statements of one kind or another [the victim made] after she returned to Franklin County"); *id.* at 67 (asking the victim's grandmother, "the story [the victim] told about being forcibly raped, that turned out to be a lie, wasn't it?"); Doc. No. 20-3 at 14 (asking the victim's grandmother's neighbor, "Did you later find out that the story [the victim] told you about being raped in the woods and duct taped was a lie?"); Doc. No. 20-4 at 5–10 (asking Detective Gass, before extended questioning on the subject, "is it fair to say, that [the victim] made up -- that she told you a whole bunch of stories?")). And as the TCCA pointed out, the prosecutor elicited testimony from the victim regarding her juvenile record. Accordingly, the TCCA reasonably determined that Petitioner failed to demonstrate prejudice from trial counsel's impeachment of the victim's credibility. Claim 3.F will be denied.

## C. Procedurally Defaulted Claims

Petitioner's remaining claims are procedurally defaulted without cause. This includes his claim of trial court error and five of his nine claims of ineffective assistance of trial counsel.

### 1. Claim 1—Trial Court Error

Petitioner asserts that the trial court made a statement at sentencing reflecting bias against Petitioner. (Doc. No. 1 at 19–20). Petitioner did not present a bias claim to the TCCA on direct or post-conviction appeal, and no state court remedies remain. *See* Tenn. Code Ann. § 40-30-102(c)

(establishing Tennessee's "one-petition" limitation on post-conviction relief); *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Fletcher v. Tennessee*, 951 S.W.2d 378, 380–81 (Tenn. 1997)) (explaining the three narrow circumstances in which a state prisoner may file a motion to reopen post-conviction proceedings, none of which apply to this claim). Petitioner also does not argue cause and prejudice of a manifest miscarriage of justice to overcome this default. Accordingly, Claim 1 is not subject to further review.

The Court notes that Petitioner challenged the same statement made by the trial court on direct appeal that he challenges here, albeit in support of a different claim. There, Petitioner argued that the court relied on non-credible statements by the victim to enhance the length of his sentence. *See Blunkall*, 2015 WL 500751, at *12 (arguing that the court inappropriately enhanced Petitioner's sentence based on the victim's "not credible" account of "the incident that transpired between [Petitioner] and the victim in the woods after leaving the motel"). Even if the Court liberally construes Claim 1 to encompass the claim exhausted in state court, however, Petitioner is still not entitled to relief. Petitioner does not present any evidence to rebut the trial court's presumptively correct factual findings at sentencing, and a claim that the state court erred in applying state sentencing law is not reviewable in this federal habeas proceeding. *See Noonan v. Burton*, No. 17-2459, 2018 WL 6584905, at *3 (6th Cir. Oct. 15, 2018) (citations omitted) (rejecting habeas petitioner's claim that "the trial court based its upward departure on unproven allegations from his oldest stepdaughter").

2. Ineffective Assistance of Trial Counsel

Five claims of ineffective assistance of trial counsel remain. These claims are procedurally defaulted because Petitioner failed to present them to the TCCA on post-conviction appeal, and he can no longer raise them in state court. *See* Tenn. Code Ann. § 40-30-102(c); *Hodges*, 727 F.3d at

50

530 (citing *Fletcher*, 951 S.W.2d at 380–81). To excuse this default based on the asserted ineffectiveness of post-conviction counsel, the claims of trial counsel ineffectiveness must be "substantial." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015) (quoting *Martinez*, 566 U.S. at 17). "A substantial claim is one that has some merit and is debatable among jurists of reason." *Id.* (citing *Martinez*, 566 U.S. at 14). "In the converse, a claim is insubstantial when 'it does not have any merit'" or "'is wholly without factual support.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15–16). As explained below, two remaining claims are entirely unsupported by facts, and three are meritless.

### A. Claims 3.A, 3.E—Wholly Without Factual Support

In Claims 3.A and 3.E, respectively, Petitioner asserts that trial counsel was ineffective for failing to remain unbiased due to the victim's age (Doc. No. 1 at 13), and secure additional testing of the rape kit to determine whether lubricant was present. (*Id.* at 13–14, 17–18, 21). These two speculative assertions are linked: the one specific example Petitioner provides of how trial counsel's supposed bias influenced his representation is that counsel's "feelings" prevented him from "request[ing] further testing" of the rape kit. (*Id.* at 14). But Petitioner has not presented any evidence regarding trial counsel's rationale, if any, to not seek additional testing of the kit. Counsel very well may have decided not to seek additional testing because he believed that, with a favorable result already in hand (all items in the rape kit testing negative for semen (*see* Doc. No. 20-4 at 53–55)), it was not worth the risk of uncovering a harmful result (such as the presence of lubricant). Such a strategic decision is presumptively sound. *See Strickland*, 466 U.S. at 689. Moreover, even if further testing of the rape kit had not detected the presence of lubricant, Petitioner fails to show prejudice. That is, there is not a reasonably probability that the trial result would have been

51

different if the jury heard testimony that the kit was negative for lubricant, in addition to semen. Accordingly, Claims 3.A and 3.E are insubstantial.

   B. <u>Claims 3.G, 3.H, 3.I—Meritless</u>

  In Claim 3.G, raised in the Reply, Petitioner asserts that trial counsel was ineffective for failing to argue that the evidence was insufficient to support a conviction. (Doc. No. 25 at 3). However, trial counsel moved for a judgment of acquittal at the close of the State's proof (Doc. No. 20-4 at 95), and again following Petitioner's testimony and the State's rebuttal. (Doc. No. 20-5 at 97). When a Tennessee court considers a motion for judgment of acquittal, it is deciding whether "the evidence is insufficient to sustain a conviction" for a charged offense. Tenn. R. Crim. P. 29(b). "The standard by which the trial court determines a motion for judgment of acquittal . . . is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Poston*, No. M2012-02321-CCA-R3CD, 2014 WL 309648, at *13 (Tenn. Crim. App. Jan. 28, 2014) (citations omitted). Thus, by moving for a judgment of acquittal, counsel was making the argument that Petitioner claims he should have made. And because the TCCA determined on appeal that there was sufficient evidence to support Petitioner's conviction, no prejudice resulted from counsel's asserted ineffectiveness in this regard. Claim 3.G is insubstantial.

  In Claim 3.H, Petitioner asserts that trial counsel was ineffective for failing to "advise the court of [the] possibility" that the jury made a finding of guilt "before hearing all of the evidence and being instructed on the applicable law." (Doc. No. 1 at 13). The Court construes this as a claim of ineffectiveness for failure to request a jury instruction on premature deliberation. The record does not include any transcript of jury selection or preliminary jury instructions, but at the close of proof, the court referenced "the original introduction" given to the jury. (Doc. No. 20-5 at 93).

The Tennessee Rules of Criminal Procedure provide that, after jurors are sworn, the court must "give them appropriate admonitions regarding their conduct during the case," including "not to form or express any opinion about the case until it is finally submitted to the jury." Tenn. R. Crim. P. 24(g)(2). This Court has no basis to assume that the trial court failed to give the required admonition at the beginning of trial. Moreover, as Respondent notes (Doc. No. 22 at 38), the court instructed the jury at the end of the first day of trial: "Don't make up your mind about any issue in the case. You haven't heard everything yet. You haven't heard the exciting charge at the end of trial. So, don't make up your mind about anything." (Doc. No. 20-2 at 194). The court reiterated this instruction at the end of the second day of trial (Doc. No. 20-4 at 94), and again just before closing arguments. (Doc. No. 20-5 at 94). Because the jury was clearly and consistently instructed not to decide any issue until after the final jury instructions, Petitioner's claim that trial counsel was ineffective for failing to request an instruction on premature deliberation is meritless.

Finally, in Claim 3.I, Petitioner asserts that trial counsel "left [him] without counsel all together[,] as stated in" *United States v. Cronic*. (Doc. No. 1 at 15). In *Cronic*, the United States Supreme Court held that "a defendant can show a Sixth Amendment violation without the need to prove prejudice when there is a 'complete denial of counsel' at, or counsel is 'totally absent' from, a 'critical stage of the proceedings.'" *Clark v. Lindsey*, 936 F.3d 467, 470 (6th Cir. 2019) (quoting *Cronic*, 466 U.S. at 658–59 & n.25). Petitioner seems to argue that counsel was ineffective under *Cronic* because he did not file a motion to suppress. (*See* Doc. No. 1 at 15 (alleging that counsel "made no attempts to defend his client" before arguing that counsel had a "duty to file" motions to suppress)). But that type of ineffective-assistance claim is analyzed under *Strickland*, not *Cronic*. *See Tighe v. Berghuis*, No. 16-2435, 2017 WL 4899833, at *4 (6th Cir. Apr. 21, 2017) ("Tighe does not clearly articulate why *Cronic* rather than *Strickland* presents the appropriate

53

standard under which to judge his claim."). And as discussed in detail above, Petitioner's claim of ineffective assistance regarding motions to suppress was adjudicated on the merits in state court, and the state court's rejection of that claim was not unreasonable. Accordingly, Claim 3.I is insubstantial.

## VI. CONCLUSION

For these reasons, Petitioner is not entitled to relief under Section 2254 and this action will be **DISMISSED**. Petitioner's request to appoint counsel (Doc. No. 25 at 10) and Motion to Render a Decision (Doc. No. 26) will be **DENIED** as moot. Additionally, the Clerk will be directed to place **UNDER SEAL** the juvenile and medical records admitted as exhibits at the post-conviction evidentiary hearing.

Because this is a "final order adverse to" Petitioner, the Court must grant or deny a certificate of appealability (COA). Habeas Rule 11(a). A COA requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "If the petition [is] denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Dufresne v. Palmer*, 876 F.3d 248, 253 (6th Cir. 2017) (quoting *Slack*, 529 U.S. at 484).

For the reasons stated throughout the Court's analysis, the Court concludes that Petitioner has not satisfied these standards and will deny a COA.

An appropriate Order shall enter.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE